WOODROW et al., Appellants,

v.

HEINTSCHEL, Appellee.

[Cite as *Woodrow v. Heintschel*, 194 Ohio App.3d 391, 2011-Ohio-1840.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–10–1206.

Decided April 15, 2011.

Stevin J. Groth, for appellants.

Jason D. Winter and Holly Marie Wilson, for appellee.

YARBROUGH, Judge.

{¶ 1} Appellants, David and Lydia Woodrow, appeal from a judgment of the Lucas County Court of Common Pleas granting summary judgment in favor of appellee, Tom Heintschel. For the following reasons, we affirm.

{¶ 2} In April 2001, the Woodrows and their company, Ann Arbor Sign, L.L.C., were named defendants in a contract action filed in the Lucas County Common Pleas Court ("the Ann Arbor litigation"). The plaintiff, Detroit Outdoor, alleged that the Woodrows had failed to perform in various respects under the terms of their contract. After initially appearing pro se, the Woodrows later sought counsel. They were eventually referred to attorney Heintschel, who filed an appearance as counsel of record for the Woodrows on August 7, 2001. A trial

date was set for May 29, 2002. Discovery ensued in the Ann Arbor litigation, and the record indicates that amended pleadings were filed and depositions taken.

{¶ 3} The parties have offered various reasons for the rapid deterioration of their relationship. Among them are claimed deficiencies in communication on both sides, the Woodrows' lack of cooperation in producing documents needed for discovery, and the failure to compensate Heintschel. Heintschel claims that in two phone calls, he indicated to the Woodrows his intention to withdraw. They admit receiving several calls from him, but dispute the substance of the conversations.

{¶ 4} On May 20, 2002, Heintschel filed a motion to withdraw as the Woodrows' counsel in the Ann Arbor litigation. The motion also requested the court to vacate the pending trial date. On May 28, 2002, the court granted the motion to withdraw, vacated the trial date, and set a pretrial conference for July 11, 2002. The next day, Heintschel mailed a letter to the Woodrows detailing the substance of these events. Thereafter, Heintschel performed no further work for the Woodrows. The court's staff and/or clerk of courts were directed to send notices of subsequent court events to the Woodrows' address listed in the court file. It is disputed whether some of the initial notices were returned; however, neither party disputes that the Woodrows moved at least twice during the litigation and left no forwarding address.

{¶ 5} The Woodrows failed to appear for the July 11 pretrial. They also failed to appear for three subsequent pretrial conferences. Following their last failure to appear, the court set a final trial date of May 1, 2003. The Woodrows again failed to appear. A bench trial was held, and Detroit Outdoor offered evidence as to its substantive contract claims. On May 12, 2003, the court entered judgment against the Woodrows in the amount of $838,000. The court afterward filed a judgment entry in which it incorporated its findings regarding the Woodrows' various nonappearances, despite the notices mailed to their last known address. The court also noted that Detroit Outdoor had "exercised extraordinary efforts to find the [Woodrows], including retaining a private investigator. The investigator determined the home in which the [Woodrows] lived was vacant and being offered for sale [and they] had ordered the agents offering the property for sale not to disclose their whereabouts."

{¶ 6} In early June 2004, the Woodrows were served at a Michigan residence with notice of a foreign judgment. The notice referred to Detroit Outdoor's default judgment in the Ann Arbor case in Lucas County. They maintain that this notice is the first time they were apprised of anything adverse. Not until July 2004 did the Woodrows contact Heintschel to obtain his defense file for the lawsuit.

{¶ 7} On July 19, 2004, the Woodrows' new attorney in the Ann Arbor litigation moved for relief from judgment under Civ.R. 60(B). On December 9, 2004, after a hearing on the motion, Judge Jensen, the trial judge in this matter, agreed to vacate it. The court found the relief warranted not only because the Woodrows had a meritorious defense to the contract action, but also because various clerical errors or irregularities had precipitated the failures to notify the Woodrows about the filing of Heintschel's withdrawal motion, the order granting it, and the later court events, including the trial wherein the $838,000 judgment was rendered.

{¶ 8} The court ruled:

{¶ 9} "[The Woodrows] are entitled to relief from the judgment because it's clear on the face of this Court's records that the order signed by this Court to withdraw was not file-stamped nor properly prepared or served upon [the Woodrows] as required by the Court's staff.

{¶ 10} "That's the Court's ultimate responsibility, and prior staff of this court may not have completed required duties. In addition, * * * there is no evidence that the notice for pretrials, as well as setting these dates for trial, were properly prepared and sent as required by law to the [Woodrows] and therefore there is sufficient evidence * * * that they did not have proper notice of the proceeding * * * nor that their attorney had withdrawn prior to that time."

{¶ 11} Notwithstanding this finding, the court further stated:

{¶ 12} "The biggest problem the Court has seen based upon all of the exhibits presented to this Court and moved into evidence is the behavior of [the Woodrows]. It's less than exemplary in terms of keeping up with the status of this case and with their prior counsel and all of the requirements of appearing, so this Court, while it's vacating the judgment against them, is placing on an order that they notify this Court today of their address, phone number where they can be reached and all notices can be sent. If there is any change of address or phone number, they are hereby ordered to make that change in writing to this Court, as well as to their counsel so that we have a place where we can send them the appropriate notice * * *."

{¶ 13} After the court granted the Woodrows relief from judgment, the Ann Arbor litigation was settled and dismissed. On May 23, 2005, they filed their professional-negligence action against Heintschel, asserting a single claim of malpractice. The alleged malpractice is that Heintschel's withdrawal without their knowledge caused the later default judgment as well as certain derivative damages. Following discovery, Heintschel moved for and was granted summary judgment. This appeal followed.

{¶ 14} The Woodrows now assign two errors for review, the second of which states:

{¶ 15} "The trial court erred to the prejudice of the plaintiff [sic] when it granted Defendant Tom Heintschel's motion for summary judgment on the issue of collateral estoppel."

{¶ 16} On appeal, summary judgments are reviewed de novo by this court. *Zemcik v. LaPine Truck Sales & Equip.* (1998), 124 Ohio App.3d 581, 585, 706 N.E.2d 860. We apply the same standard as the trial court, viewing the facts in a light most favorable to the nonmoving party and resolving any doubts in favor of that party. *Viock v. Stowe–Woodward Co.* (1983), 13 Ohio App.3d 7, 12, 13 OBR 8, 467 N.E.2d 1378.

{¶ 17} A claim for legal malpractice requires proof of the following elements: (1) the attorney owed a duty or obligation to the plaintiff, (2) there was a breach of that duty or obligation and the attorney failed to conform to the standard required by law, and (3) there is a causal connection between the conduct complained of and the resulting damage or loss. See *Vahila v. Hall* (1997), 77 Ohio St.3d 421, 674 N.E.2d 1164, following *Krahn v. Kinney* (1989), 43 Ohio St.3d 103, 538 N.E.2d 1058. The plaintiff's failure to prove any one of these elements entitles the defendant-attorney to summary judgment. *Greene v. Barrett* (1995), 102 Ohio App.3d 525, 531–533, 657 N.E.2d 553 (lack of proximate cause warrants summary judgment in legal-malpractice action).

{¶ 18} In its summary-judgment ruling, the trial court found that because collateral estoppel prevented relitigation of the causation issue, the Woodrows would be unable to prove the necessary proximate-cause element of their claim. The estoppel issue here is predicated on the series of clerical errors in either failing to send court orders and other notices to the Woodrows' correct address, or in failing to send them at all.

{¶ 19} Sometimes called "issue preclusion," the elements of collateral estoppel are well established. In essence, the doctrine provides that facts or issues that were fully, fairly, and necessarily determined between the parties in a prior judicial setting may not be relitigated in a later action, regardless of whether the claims in the two actions are identical or different. *Ft. Frye Teachers Assn. OEA/NEA v. State Emp. Relations Bd.*, 102 Ohio St.3d 283, 2004-Ohio-2947, 809 N.E.2d 1130, at ¶ 10, citing *Krahn v. Kinney,* 43 Ohio St.3d 103, 538 N.E.2d 1058; *Mitchell v. Internatl. Flavors & Fragrances, Inc.*, 179 Ohio App.3d 365, 2008-Ohio-3697, 902 N.E.2d 37, ¶ 13–14. This case involves an instance of the "defensive" use of collateral estoppel, in that Heintschel invoked it below as a shield against the malpractice action. See *Hoover v. Transcontinental Ins. Co.*, 2nd Dist. No. 2003–CA–46, 2004-Ohio-72, 2004 WL 41489, at ¶ 15.

{¶ 20} The Woodrows initially argue that the trial court misapplied collateral estoppel when it ruled that Judge Jensen had previously determined at

the Rule 60(B) hearing that the court's own failure to notify and properly serve the Woodrows had resulted in the default judgment. Instead, the Woodrows claim, the pertinent causation issues that were *not* litigated there all relate to Heintschel's allegedly surreptitious withdrawal, i.e., whether Heintschel had "lied" about the Ann Arbor case being dismissed, whether he had failed to tell them that he was withdrawing, and whether his withdrawal comported with the Code of Professional Responsibility. Separately, the Woodrows maintain that because the motion to withdraw was never file-stamped, due either to clerk or court-staff error, no motion came before the court.

{¶ 21} Since this last argument speaks to the integrity of the record, it will be addressed first. We have examined the record; and plainly, Heintschel did submit to the court a document entitled "Motion to Withdraw as Counsel and for Postponement of Trial." This document is in the form of a written motion. The motion's "Certification of Service" contains a contemporaneous date certifying that it was "telefaxed and mailed" to opposing counsel on "May, 20, 2002." Nothing in the record indicates that opposing counsel failed to receive this motion.

{¶ 22} The affidavit of Judge Jensen was submitted in support of Heintschel's motion for summary judgment. Paragraph 6 of this affidavit avers that Heintschel "filed" the withdrawal motion and also "tendered an Order granting the motion * * * at the time of filing. These documents were in the case file at the Clerk's Office of the Court but the clerk did not file-stamp the motion or include it on the docket." The Jensen affidavit then indicates that "[the motion and the order] were provided to me in person by Mr. Heintschel on May 20, 2002, and I believed the motion to be file-stamped and journalized *and treated it as such.*" (Emphasis added.) Judge Jensen thereafter granted the withdrawal motion. He prepared and signed his own order rather than the one Heintschel submitted, and he then set a pretrial conference for July 11, 2002. The order that Judge Jensen drafted and signed contains both his signature and a signing date of May 28, 2002.

{¶ 23} We thus agree with Heintschel that it is disingenuous to maintain as appellants do in their brief that "there is absolutely nothing to indicate that the [withdrawal] motion was filed with either the Court or the Judge." This claim ignores the substance of the actual facts. First, the clerical errors involved—i.e., not file-stamping or properly journalizing various documents—are admitted. Second, it is not disputed that the court (or its staff) failed to serve the Woodrows with proper notice.[1] Third, the Woodrows have offered nothing to refute the

---

1. Regarding these notice failures, after initially stating that the trial court was "not negligent," counsel for the Woodrows then asserts that the court and Heintschel "were [both] negligent

facts involving the withdrawal motion or the order granting it. Instead, they claim that it was Heintschel's professional negligence and/or violation of the disciplinary rules, rather than court or clerical errors, that caused their injury, i.e., the default judgment of May 12, 2003. But this merely raises the question of causation.

{¶ 24} The court acted as if Heintschel had withdrawn (as did Heintschel himself, participating no further), and after May 28, 2002, it treated the Woodrows as pro se civil defendants and assumed the responsibility of notifying them. Heintschel's withdrawal as counsel severed any connection to the court's scheduling of the later hearings and the bench trial at which the Woodrows were absent. It was the failure to serve them with notice of these events that led directly to the default judgment one year later, the "injury" alleged in the malpractice complaint. Even assuming as true the Woodrows' claims about Heintschel's earlier conduct, they have no relevance to the estoppel issue.

{¶ 25} In modern applications of collateral estoppel, we note that the stricter res-judicata requirement of identity or "mutuality" of the parties is relaxed. See *Mitchell,* 179 Ohio App.3d 365, 2008-Ohio-3697, 902 N.E.2d 37, at ¶ 27. It is merely sufficient to show that "the party against whom the doctrine is asserted previously had his day in court and [there] was permitted to fully litigate the specific issue sought to be raised in the later action." Id. at syllabus; see also *Wilson v. Britz & Zemmelman* (Jan. 10, 1992), 6th Dist. No. L–91–031, 1992 WL 2543.

{¶ 26} Applying the elements of collateral estoppel to the facts here, we find that (1) the Woodrows were a party in the prior action, coming before the court under Civ.R. 60(B) to seek relief from a default judgment as to which they were originally the named defendants, (2) after the Woodrows were given a full and fair opportunity to litigate the cause of that judgment, a final judgment on the merits was entered granting the relief sought, (3) the causation issue and the predicate facts relating to it (i.e., the notice failures) were actually tried and determined at the hearing and were found to be a meritorious reason warranting relief, and (4) the causation issue directly adjudicated during that hearing is identical to the causation issue in their malpractice action. See *Mitchell* at ¶ 14.

{¶ 27} Once Judge Jensen issued the order granting Heintschel leave to withdraw, the duty of notifying putatively pro se civil defendants fell to the court and its staff. At the Rule 60(B) hearing some 18 months later, Judge Jensen

---

and were therefore concurrent tortfeasors." No authority is offered to support this theory, and it was not raised in the trial court. Therefore, it will not be considered for the first time on appeal. *Stores Realty Co. v. Cleveland* (1975), 41 Ohio St.2d 41, 43, 70 O.O.2d 123, 322 N.E.2d 629.

identified and determined as a factual matter on whom the duty fell to provide notice and how that duty went unfulfilled. Precisely because of that finding, the Woodrows prevailed at the hearing. Therefore, the issue of what directly caused the judgment against them had already been adjudicated when they filed their malpractice suit against Heintschel in May 2005.[2]

{¶ 28} The trial court correctly applied collateral estoppel to prevent relitigating the causation issue in the malpractice action, and thus summary judgment was appropriate.

{¶ 29} Accordingly, the second assignment of error is not well taken.

{¶ 30} The Woodrows' first assignment of error states:

{¶ 31} "The trial court erred to the prejudice of the plaintiff when it granted Defendant's Tom Heintschel's [sic] and denied the plaintiff's cross motion for summary judgment."

{¶ 32} Initially we note that the Woodrows filed no "cross motion for summary judgment." In this assignment, they challenge the court's alternate ruling that their legal-malpractice claim was time-barred under the statute of limitations. In malpractice cases, the question of when a claim accrues under this statute is a question of law that we review de novo. *Whitaker v. Kear* (1997), 123 Ohio App.3d 413, 420, 704 N.E.2d 317. The parties agree that R.C. 2305.11(A) establishes a one-year limitation period for legal-malpractice claims, but they hotly dispute when that period commenced. On this issue, the Ohio Supreme Court has set forth a disjunctive test:

{¶ 33} "Under R.C. 2305.11(A), an action for legal malpractice accrues and the statute of limitations begins to run when there is a cognizable event whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act and the client is put on notice of a need to pursue his possible remedies against the attorney *or* when the attorney-client relationship for that particular transaction or undertaking terminates, whichever occurs later." (Emphasis added.) *Zimmie v. Calfee, Halter & Griswold* (1989), 43 Ohio St.3d 54, 538 N.E.2d 398; *Omni–Food & Fashion, Inc. v. Smith* (1988), 38 Ohio St.3d 385, 528 N.E.2d 941.

{¶ 34} We will analyze the facts here under each prong of the *Zimmie* syllabus for record evidence of either some "cognizable event" or an act by either party that terminated the relationship.

---

2. Notwithstanding the admitted clerical errors with the court notices, we agree with the trial court that the record fairly suggests some attempt by the Woodrows to evade process until June 2004, when they were finally located and served with notice of the Lucas County judgment.

### (1) "Cognizable Event."

{¶ 35} The Woodrows maintain that they had no knowledge that Heintschel had withdrawn from representing them, no knowledge of anything relating to the Ann Arbor litigation after May 2002, and no specific knowledge of the Lucas County default judgment until they were served in Michigan in June 2004. Therefore, they argue, their malpractice action, filed May 23, 2005, was timely. In response, Heintschel argues that the one-year statute of limitations began running in early May 2002, when the Woodrows became dissatisfied with his handling of the case.

{¶ 36} That the attorney-client relationship ·is one based on trust and mutual confidence is well established. See *Smith v. Conley,* 109 Ohio St.3d 141, 2006-Ohio-2035, 846 N.E.2d 509, at ¶ 6; *Fox & Assoc. Co., L.P.A. v. Purdon* (1989), 44 Ohio St.3d 69, 71, 541 N.E.2d 448. A "cognizable event" is something "noteworthy" that should have alerted a reasonable person that a questionable legal practice may have occurred. *Zimmie,* 43 Ohio St.3d at 57–58, 538 N.E.2d 398. It is treated in terms of notice or awareness, and can be actual or constructive. *Flowers v. Walker* (1992), 63 Ohio St.3d 546, 549, 589 N.E.2d 1284; *Spencer v. McGill* (1993), 87 Ohio App.3d 267, 278, 622 N.E.2d 7. Such notice can be as simple as the client's sense of a possible problem with the attorney's handling of a matter, given other circumstances present. When it occurs, the client is then obliged to act and make inquiry ("to pursue his * * * remedies," *Zimmie,* syllabus), not ignore the issue and refrain from action. See *Halliwell v. Bruner* (Dec. 14, 2000), 8th Dist. No. 76933, 2000 WL 1867398 ("[k]nowledge of a potential problem starts the statute to run, even when one does not know all the details"); *Omlin v. Kaufman & Cumberland Co., L.P.A.* (C.A.6, 2001), 8 Fed. Appx. 477, 479, 2001 WL 493387 (statute began to run when client "perceived 'mistakes in lawyering' ").

{¶ 37} David Woodrow's deposition testimony provides sufficient evidence of a cognizable event in May 2002. Because of what the Woodrows perceived as "long periods" of inactivity in the litigation, he and his wife were "confused" about "where [the case] stood and where it didn't stand." Woodrow testified that over the time Heintschel represented them, they had five or six phone conversations. Woodrow could not remember the dates or times of these calls.[3] He testified that in one of the calls, Heintschel told them that the Ann

---

**3.** Heintschel agrees that he called the Woodrows a number of times. His deposition testimony placed these dates in later April and early May 2002. Woodrow's statement that he "couldn't recall" the dates is a "neutral answer" or nonassertive response rather than a denial. Cf. *State v. Keenan* (1993), 66 Ohio St.3d 402, 412, 613 N.E.2d 203. It does not create a material factual question when contrasted with Heintschel's more specific testimony. The trial court

Arbor litigation had been "dropped" or "dismissed," without further explanation. Heintschel disputes this. But even before receiving this particular call, the Woodrows were dissatisfied with Heintschel's representation.

{¶ 38} After Heintschel's unexpected phone call about the alleged dismissal (an outcome Woodrow described as "victorious"), the Woodrows never received a bill for attorney fees. Nor did they ask for or receive from Heintschel any corroborating document, such as a signed judgment entry of dismissal or even a follow-up letter. In fact, Woodrow denied ever receiving anything in writing from Heintschel. He twice stated that their dissatisfaction with Heintschel and their confusion arose from "the time lags and the lack of written communication or correspondence on the part of Mr. Heintschel * * *." Although Woodrow admitted that he could have initiated contact with Heintschel to resolve their confusion, discuss the case, or schedule a meeting, he never did. Woodrow acknowledged having personal experience with other attorneys and with their typical manner of communicating on client matters. He had expected more responsiveness from Heintschel on the status of the Ann Arbor lawsuit. Woodrow also stated that he was familiar with "a court['s] docket [and] discovery, trial, pretrial, all those issues."

{¶ 39} The Woodrows argue that to show a cognizable event, it is necessary to prove when the client knew or should have known of the legal "element of [his] damages." They contend that this did not occur until June 2004, when they were served with notice of the foreign judgment. However, that contention is not supported by the case law. See, e.g., *Nicholas v. Deal* (Dec. 31, 2003), 12th Dist. No. CA 2002–10–242, 2003 WL 23095470, citing *Flowers v. Walker*, 63 Ohio St.3d at 549, 589 N.E.2d 1284 ("[C]onstructive knowledge of [the] facts, rather than actual knowledge of their legal significance" begins the statute running); *Spencer*, 87 Ohio App.3d at 278, 622 N.E.2d 7 (" 'Injury' is not defined monetarily; rather, it is defined in terms of notice"); *DiSabato v. Tyack & Assoc. Co., L.P.A.* (Sept. 14, 1999), 10th Dist. No. 98AP–1282, 1999 WL 715901 (legal-malpractice claim "accrues not when actual damages occur as a result of some judicial determination, but when [the plaintiff] knew or should have known of counsel's alleged failure").

{¶ 40} The test for identifying a cognizable event is an objective one. *Zimmie*, 43 Ohio St.3d 54, 538 N.E.2d 398; *Spencer*, 87 Ohio App.3d 267, 622 N.E.2d 7. On these facts, how would a reasonable person in the Woodrows' position, dissatisfied with Heintschel's taciturn behavior and already frustrated with the amount of time the litigation had consumed, have reacted? The test necessarily takes into

could thus accept May 2002 as the relevant time-frame for the later calls, since the Woodrows admit receiving them.

account all the relevant facts and circumstances. Here, the Woodrows admitted losing confidence in Heintschel even before his pithy call about the lawsuit being "dropped." Afterwards, they never inquired about, and were apparently not troubled by, the failure to receive some corroborating paperwork from Heintschel, even so much as a fee statement. Their admitted experience with attorneys and with court procedure should have suggested—and would have suggested to a reasonable person—that there was something odd or inconsistent in Heintschel's bare statement of "victory" (if the statement was made as claimed).

{¶ 41} Denials of knowledge are tested against the standard of "whether in the exercise of reasonable diligence [the plaintiff] should have known about" the alleged malpractice earlier. *Halliwell*, 2000 WL 1867398, at *6. Reasonable diligence thus entails some effort by the client to dispel his confusion, doubt, or suspicion. As the trial court suggested in its summary-judgment order, some minimal inquiry on the Woodrows' part was warranted "to clarify their admitted uncertainty regarding the litigation filed against them for more than two years." Viewing the facts most favorably to the Woodrows, the trial court found that they were chargeable with constructive awareness of a cognizable event in May 2002 that started the statute running. We agree. If, as they now claim, Heintschel "lied" about the dismissal in May 2002, then had they used reasonable diligence afterward, they would have learned that the facts were otherwise. Under this prong of the *Zimmie* syllabus, their malpractice complaint, filed three years later, was time-barred. Id.

(2) "Termination" Test.

{¶ 42} On appeal, the Woodrows argue first, as they did below, that for the relationship to terminate, the client provably must know that it has ended. They steadfastly deny knowing that Heintschel had withdrawn. Second, in withdrawing from the representation, the attorney must comport with the Code of Professional Responsibility, which, they also argue, includes promptly returning the client's file. Otherwise, there is no effective withdrawal and the one-year limitation period does not begin to run. The Woodrows then argue that even assuming that Heintschel properly withdrew, he still remained counsel of record from May 2002 until sometime in 2009, when the clerical mistakes were finally corrected, the motion was file-stamped, and the order was journalized. We reject these contentions for the same reasons as the trial court.

{¶ 43} Under *Zimmie*'s termination rule, courts look for a discrete act (or acts) by either party that signals the severing of their relationship. Id.; *Smith v. Conley*, 109 Ohio St.3d 141, 2006-Ohio-2035, 846 N.E.2d 509, at ¶ 12 (the "date of termination * * * is a fact-specific determination * * *"); *Mastran v. Marks*

(Mar. 28, 1990), Summit App. No. 14270, 1990 WL 34845 ("[T]he termination of the * * * relationship depends, not on a subjective loss of confidence on the part of the client, but on conduct, an affirmative act by either the attorney or the client that signals the end of the relationship").

{¶ 44} Heintschel maintains that his filing of the withdrawal motion was the "clear and unambiguous signal" of termination. Arguing instead that the client's knowledge, or lack of it, controls termination, the Woodrows cite *Markham v. Brandt* (Mar. 27, 2006), S.D. Ohio No. C–1–03–785, 2006 WL 783464. However, the *Markham* court plainly held, without referring to the client's knowledge or understanding, that "[b]ecause there is no indication * * * that [the attorney] took any action on plaintiff's behalf following issuance of the Sixth Circuit's decision on May 8, 2001, the attorney-client relationship terminated no later than that date." Id. at *4. Thus, in *Markham*, the attorney's *cessation of work* terminated the attorney-client relationship, not whether or when his client knew that he had ceased work.

{¶ 45} Moreover, to base the start of the one-year period on the client's subjective knowledge would allow a client to manipulate the statute's commencement by simply denying knowledge about any unambiguous act the attorney took that would otherwise be sufficient to terminate the relationship (e.g., denying knowledge that the attorney had ceased work or denying receipt of any verbal or written communication of withdrawal). This would replace the "affirmative conduct *by either party* " with the subjective knowledge of *one* party as the exclusive test for termination. That would be unworkable as a practical matter and contrary to *Zimmie*, 43 Ohio St.3d 54, 538 N.E.2d 398, and the import of *Smith v. Conley*, 109 Ohio St.3d 141, 2006-Ohio-2035, 846 N.E.2d 509.

{¶ 46} Further, regarding the Code of Professional Responsibility, the Woodrows cite no authority holding that attorney compliance with its provisions is necessary before the statute of limitations can begin to run. That too would be at odds with the clear language of the "termination" prong of the *Zimmie* syllabus, and the Supreme Court has elsewhere implied that neither the disciplinary rules of the code nor local court rules control the question of when the attorney-client relationship terminates. Rather, it is the "actions of the parties." See *Smith* at ¶ 6–12.

{¶ 47} We turn finally to the argument that clerical failures to file-stamp or journalize the court's order granting the motion to withdraw delayed the running of the statute of limitations until 2009. The premise underlying this contention is inconsistent with the case law. It is not the *granting* of the motion that severs the relationship or starts the statute running. See *Smith*; *Wozniak v. Tonidandel* (1997), 121 Ohio App.3d 221, 227, 699 N.E.2d 555 (finding meritless "[p]laintiff's argument that [the] representation lasted until the court granted [the

attorney's] motion to withdraw[* * *]"); *Omlin,* 8 Fed.Appx. 477, 479 ("An attorney-client relationship is not continued or extended * * * by the amount of time it takes the attorney to withdraw as counsel"). Since the running of the statute is not dependent on the order granting counsel's withdrawal, errors in journalizing the order similarly do not thwart its commencement. Moreover, the termination test for identifying when the relationship is severed focuses on affirmative conduct *by the parties*—the attorney or the client. Plainly the court is not a party.

{¶ 48} In its summary-judgment ruling, the court found that the act that terminated the attorney-client relationship was Heintschel's filing of the motion to withdraw on May 20, 2002, citing *McGlone v. Rodeheffer* (July 22, 1994), 4th Dist. No. 93CA2130, 1994 WL 386094. However, the *McGlone* court actually took a cumulative approach to determining termination. The date the *McGlone* court used was not the motion's filing date alone, but rather a series of dates reflecting several unambiguous actions. These included the date on which the plaintiff asked his attorney to resign, the date on which the attorney filed his motion to withdraw, and the date on which the court granted the motion.[4] Id. We also note that two appellate districts, the Eighth and the Third, have held that the attorney's act of sending a letter to the client, indicating that the representation has ended, "can terminate the attorney-client relationship." This can occur well before a motion is filed, although here Heintschel sent his letter the day after his motion was granted. See *Wozniak* at 226, 699 N.E.2d 555; *Hickle v. Malone* (1996), 110 Ohio App.3d 703, 706–707, 675 N.E.2d 48. Under the circumstances here, the relationship between Heintschel and the Woodrows did terminate in May 2002, but it did so based on the unambiguous *acts* of Heintschel's filing the motion and his cessation of work for the Woodrows. Indeed, the parties fully agree that after May 2002, Heintschel did nothing further in the Ann Arbor litigation.

{¶ 49} Normally that would not end the analysis, for *Zimmie* requires a reviewing court to compare the accrual dates for both the cognizable event and the act of termination. 43 Ohio St.3d at 58, 538 N.E.2d 398. The plaintiff draws the benefit of the later date. Id. In some cases, there could be a significant difference in the time between the two, whereby using one date takes the plaintiff's malpractice claim beyond the one-year period, but using the other date places his claim within the time period. Here, however, both dates accrued no

---

4. *McGlone* was decided in 1994. In 2006, the Supreme Court held that the filing of a withdrawal motion by itself, even when done in strict compliance with a local court rule, is not necessarily the controlling date if other acts or circumstances point to an early termination. See *Smith v. Conley,* 109 Ohio St.3d 141, 2006-Ohio-2035, 846 N.E.2d 509, at ¶ 6–7. Hence, the analysis must be "fact-specific." Id.

later than May 2002, so the Woodrows' complaint, filed May 23, 2005, was time-barred as a matter of law. Summary judgment was thus appropriate under *Zimmie.*

{¶ 50} Accordingly, the Woodrows' first assignment of error is not well taken.

{¶ 51} On consideration whereof, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

PIETRYKOWSKI and SINGER, JJ., concur.