[Cite as *Axline v. Conners, L.L.C*, 2015-Ohio-4679.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Karen Axline, | : | |
| Plaintiff-Appellant, | : | |
| | | No. 14AP-924 |
| v. | : | (C.P.C. No. 11CVA-7006) |
| Kevin R. Conners, LLC et al., | : | (ACCELERATED CALENDAR) |
| Defendants-Appellees/ Third-Party Plaintiffs, | : | |
| | : | |
| ProAssurance Casualty Company, | | |
| | : | |
| Third-Party Defendant-Appellee. | : | |

D E C I S I O N

Rendered on November 12, 2015

*F. Harrison Green Co., LPA*, and *F. Harrison Green*, for appellant.

*Peterson, Conners, Fergus & Peer LLP, Gregory S. Peterson*, and *Istvan Gajary*, for defendants-appellees.

*Roetzel & Andress, LPA, Bradley L. Snyder*, and *Jeremy S. Young*, for third-party defendant-appellee.

APPEAL from the Franklin County Court of Common Pleas.

KLATT, J.

{¶ 1} Plaintiff-appellant, Karen Axline, appeals a judgment of the Franklin County Court of Common Pleas that granted summary judgment to defendants-appellees, Kevin R. Conners and Kevin R. Conners, LLC, as well as third-party-defendant,

ProAssurance Casualty Company. For the following reasons, we reverse the grant of summary judgment to defendants and affirm the grant of summary judgment to ProAssurance.

{¶ 2} From 2000 to 2007, Axline owned and operated Granville Title Agency, Limited. In early 2007, the Ohio Attorney General's office began investigating mortgage loans on which Axline had acted as title agent. The attorney general suspected that Axline had closed multiple fraudulent loans. Axline hired Conners to represent her in connection with the investigation and any future criminal charges.

{¶ 3} Ultimately, Axline was indicted on over 40 counts, including counts for theft, receiving stolen property, money laundering, and falsification. In August 2009, Axline pleaded guilty to ten counts. Axline accepted a plea deal believing that she would only receive community control and the state would not file a sentencing recommendation.

{¶ 4} Contrary to Axline's understanding, two days before her sentencing, the state filed a sentencing memorandum in which it contended that "a sentence of imprisonment of at least six years is necessary to adequately address the Defendant[']s actions." (Oct. 21, 2009 Sentencing Memorandum, 1-2.) The trial court sentenced Axline to a four-year term of imprisonment at the October 23, 2009 sentencing hearing.

{¶ 5} In May 2010, Axline moved for judicial release. The trial court granted that motion, and released Axline from prison in December 2010.

{¶ 6} On June 7, 2011, Axline filed a legal malpractice action against Conners.[1] Axline alleged that Conners negligently (1) misrepresented to her that she would receive community control and the state would not file a sentence recommendation prior to sentencing, (2) failed to file a sentencing memorandum on her behalf prior to her sentencing, (3) failed to obtain in writing the state's agreement not to recommend a sentence, (4) failed to provide an affirmative defense, (5) failed to investigate case law related to mortgage fraud to acquire the knowledge necessary to competently represent her, (6) failed to call witnesses or present mitigating evidence at the sentencing hearing, (7) advised her to not respond to the impact witness who testified at the sentencing hearing, (8) misrepresented the facts underlying the charges to the trial court at the sentencing hearing, (9) failed to address inaccuracies in the indictment, (10) failed to

_____

[1] Axline later amended her complaint to add Kevin R. Conners, LLC as a defendant.

disclose to her that he intended to negotiate a plea rather than prove her innocence, and (11) failed to properly prepare her for a proffer session with the state that occurred prior to sentencing.

{¶ 7} Defendants answered Axline's complaint and filed a third-party complaint against ProAssurance, which provided Kevin R. Conners, LLC with professional liability insurance. Defendants alleged that ProAssurance had breached the insurance policy by denying them coverage for Axline's claims. Defendants sought damages and specific performance.

{¶ 8} Both defendants and ProAssurance moved for summary judgment. Defendants argued that the statute of limitations barred Axline from asserting her malpractice claims. ProAssurance argued that defendants' insurance coverage did not apply to Axline's claims because the actions underlying those claims either occurred or were related to conduct that occurred prior to the policy's retroactive date.

{¶ 9} In a judgment dated October 9, 2014, the trial court granted both defendants' and ProAssurance's motions for summary judgment. Axline now appeals that judgment and assigns the following errors:

> [I.] The trial court erred in granting Appellees-Defendants, Kevin R. Conners, LLC and Kevin R. Conners' Motion for Summary Judgment on all Counts of Appellant-Plaintiff's Amended Complaint.
>
> [II.] The trial court erred in granting Appellee-Third-Party Defendant, ProAssurance Casualty Company's Motion for Summary Judgment on Counts One and Two of the Appellee - Conners Defendants' Third Party Complaint.

{¶ 10} Axline's assignments of error challenge the trial court's rulings on summary judgment. A trial court will grant summary judgment under Civ.R. 56 when the moving party demonstrates that: (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion when viewing the evidence most strongly in favor of the non-moving party, and that conclusion is adverse to the non-moving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29; *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d 158, 2007-Ohio-5584, ¶ 29. Appellate review of a trial court's ruling on a motion for summary judgment is de novo. *Hudson* at ¶ 29. This means that an appellate court

conducts an independent review, without deference to the trial court's determination. *Zurz v. 770 W. Broad AGA, L.L.C.*, 192 Ohio App.3d 521, 2011-Ohio-832, ¶ 5 (10th Dist.); *White v. Westfall*, 183 Ohio App.3d 807, 2009-Ohio-4490, ¶ 6 (10th Dist.).

{¶ 11} By her first assignment of error, Axline argues that genuine issues of material fact precluded the trial court from determining, as a matter of law, the date on which the attorney-client relationship between her and Conners terminated. Because the evidence on that issue is conflicting, Axline maintains that the trial court could not decide on summary judgment whether she filed her legal malpractice claims within the one-year statute of limitations. We agree.

{¶ 12} A party must file a claim for legal malpractice within one year of the time the cause of action accrues. R.C. 2305.11(A); *Smith v. Conley*, 109 Ohio St.3d 141, 2006-Ohio-2035, ¶ 4. An action for legal malpractice accrues "when there is a cognizable event whereby the client discovers or should have discovered that his injury was related to his attorney's act or non-act and the client is put on notice of a need to pursue his possible remedies against the attorney or when the attorney-client relationship for that particular transaction or undertaking terminates, whichever occurs later." *Zimmie v. Calfee, Halter & Griswold*, 43 Ohio St.3d 54 (1989), syllabus. This test requires two factual determinations: (1) when the client knew or should have known that his attorney may have caused him injury, and (2) when the attorney-client relationship terminated. *Smith* at ¶ 4. The statute of limitations starts running on the latter of the two dates. *Id.*

{¶ 13} Here, the trial court determined that Axline should have known that Conners may have injured her at the close of her October 23, 2009 sentencing hearing. Axline does not dispute that determination. Rather, she argues that the trial court erred in determining, as a matter of law, when the attorney-client relationship between her and Conners terminated.

{¶ 14} Generally, the attorney-client relationship is consensual, subject to termination by the acts of either party. *Boggs v. Baum*, 10th Dist. No. 10AP-864, 2011-Ohio-2489, ¶ 19. To determine whether an attorney-client relationship has ended, " 'courts look for a discrete act (or acts) by either party that signals the severing of their relationship.' " *Cotterman v. Arnebeck*, 10th Dist. No. 11AP-687, 2012-Ohio-4302, ¶ 16, quoting *Woodrow v. Heintschel*, 194 Ohio App.3d 391, 2011-Ohio-1840, ¶ 43 (6th Dist.);

*accord Smith* at ¶ 9 ("[T]he date of termination of the attorney-client relationship * * * is to be determined by considering the actions of the parties."). Such acts include one party sending the other a letter stating that the attorney-client relationship is over, as well as the client's retention of another attorney for representation in the same matter for which the client had retained previous counsel. *Nichter v. Shamansky*, 10th Dist. No. 14AP-811, 2015-Ohio-1970, ¶ 19-20; *Burzynski v. Bradley & Farris Co., L.P.A.*, 10th Dist. No. 01AP-782 (Dec. 31, 2001).

{¶ 15} The question of when an attorney-client relationship terminates is a question of fact. *Smith* at ¶ 9. However, a court may decide the question as a matter of law if either party has undertaken affirmative actions that are patently inconsistent with the continued attorney-client relationship. *Boggs* at ¶ 18. "For a trial court to grant summary judgment on the grounds that an act of either party has terminated the attorney-client relationship, the 'act must be clear and unambiguous, so that reasonable minds can come to but one conclusion from it.' " *Duvall v. Manning*, 11th Dist. No. 2010-L-069, 2011-Ohio-2587, ¶ 27, quoting *Mastran v. Marks*, 9th Dist. No. 14270 (Mar. 28, 1990).

{¶ 16} In the case at bar, the parties have vastly different recollections regarding the course of their relationship after Axline's sentencing. According to Conners, either the day of or the day after Axline's sentencing, he told Axline's daughter-in-law, Candace Axline, that he could no longer represent Axline.[2] In his deposition, Conners testified he told Candace:

> [U]nder these circumstances, given what this judge has done, I believe that it is in Karen's best interest for someone else to be able to approach this judge and deal with this situation because [the judge] literally * * * said one thing to me and did another.

(Conners Depo., 100-01.) Conners believed that, after that conversation, Axline retained another attorney, W. Joseph Edwards, "to do whatever would be next." (Conners Depo., 101.)

{¶ 17} Axline, however, testified in her deposition that, sometime in the two weeks after her sentencing, Conners visited her in the Franklin County Jail. During that visit,

---

[2] Candace Axline is a corporate tax attorney who practices in California.

Conners told her that "[w]e need more eyes on this." (Axline Depo., 30.) According to Axline, that was when "Candace found Joe [Edwards]. And the intention was for him to work with Kevin to get me out of there." (Axline Depo., 30.) Axline later clarified that Conners "advised [her] to get someone to look at the case [and] also to file the appeal and then they would work together." (Axline Depo., 39.) While visiting Axline at jail, Conners also told her that he was "sorry this has happened" and he would "fix it." (Axline Depo., 93.)

{¶ 18} Five days after Axline's sentencing, Conners filed a motion for reconsideration with the trial court. On November 9, 2009, Conners filed a reply in support of that motion.[3] The reply was the last filing Conners submitted to the court on Axline's behalf. On November 25, 2009, Edwards filed a notice of appeal for Axline.

{¶ 19} According to Axline, Edwards visited her in prison in February 2010 and told her that he and Conners had decided that a motion for judicial release, rather than an appeal, was the "quickest route out of prison." (Axline Depo., 172.) Axline agreed to voluntarily dismiss her appeal, and Edwards filed a dismissal notice in March 2010.

{¶ 20} While Axline was incarcerated, she had difficulty communicating with people outside of prison. Consequently, she asked Candace to communicate with Edwards and Conners on her behalf. On April 11, 2010, Candace sent an email to Edwards and Conners about seeking judicial release for Axline. The email stated:

> It is [Axline's] understanding that you two will be working together in this process. If you could take a minute and walk us through this process, it would be greatly appreciated. * * * Is there an overall strategy for what will be presented? Will you need anything from us or any of the other family members? Please let us know if we can be of any assistance with this petition.

(Exhibit A-3.)

{¶ 21} When Candace received no reply, she sent a second email, asking Edwards and Conners if they could "at least confirm whether [they were] in fact preparing and submitting Karen's judicial release petition." (Exhibit A-3.) This time, Conners responded, stating that he "need[ed] to figure out what's the best way to do do [sic] this," and he would call Edwards. (Exhibit A-3.)

---

[3] The trial court denied the motion for reconsideration on December 1, 2009.

{¶ 22} On April 29, 2010, Conners emailed Candace again, stating:

> I just spoke with Joe Edwards - here is what we are going to do:
>
> 1. Joe is going to check the statute to confirm the first date that the motion can be filed.  (I will too). * * *
>
> 2. In the meantime it makes some sense for someone (you or whoever you think is best) to outline what Karen's plans are upon release.  The basics.  I don't need a book — but we are going to have to tell the court what those plans are at some point anyway.  I am thinking a Word document - and send it to me.
>
> 3. * * * I will also find out what the drill is [regarding requesting an institutional report regarding Axline].
>
> Once I talk to my friend that has done a fair number of these I will figure what else it is we have to do.

(Exhibit A-2.)

{¶ 23} Candace then asked Conners how many hours it would take to draft and file the motion for judicial release.  Conners responded that "it is safe to say we are talking 5-10 hours at a minimum.  My plan is to make this as simple as possible."  (Exhibit A-2.) When Candace expressed surprise at that length of time, Conners replied:

> I am thinking right now that I need to spend at least a couple hours — like 2 or 3 — to see that things are set up right to happen ASAP.  I need to start doing that — and see what comes up as I proceed.  Probably makes the most sense to just let you know what I need to do (when I know) — and I can estimate how much time might be involved.

 (Exhibit A-2.)

{¶ 24} On May 6, 2010, Candace emailed Conners regarding her dissatisfaction with the estimate of Edwards' paralegal that it would take two weeks "to get everything pulled together, reviewed by Joe, and filed with the court."  (Exhibit A-4.)  Candace stated, "This is exactly why Karen wants your continued involvement.  She trusts you to be working towards her best interests.  Is there anything that can be done to get this thing filed sooner rather than later?"  (Exhibit A-4.)  Conners replied that "[w]e need to file the request itself to get things moving.  There are a few additional things to do — but we need

to do that first."  (Exhibit A-4.)  The next day, Conners sent Candace a motion for judicial release that another attorney had filed in a different case to review as an example. Conners stated that he had "done nothing to it yet."  (Exhibit A-4.)

{¶ 25} On May 17, 2010, Edwards filed the motion for judicial release with the trial court.  Conners did not sign the motion.  In response to the motion, the state requested to speak with Axline. However, Axline mistrusted the prosecutors and had deep reservations about meeting with them again.   In a June 21, 2010 email to Edwards and Conners, Candace explained Axline's concerns and stated:

> Joe and Kevin, I know you are extremely busy; however, Karen desperately needs the advice of her attorneys here.  She has asked us to consult with another attorney, and I would like to avoid that if at all possible.  However, our backs are against the wall.  A meeting with the prosecution could have catastrophic consequences if Karen does not get adequate information and representation before this meeting.
>
> Joe – [Your paralegal] said you would call me today to discuss the purpose of the meeting.  Is it possible for you to call [the prison] and speak with Karen directly? * * * If you are too busy * * *, please just let us know, no hard feelings, we'll find someone else who can dedicate the time to focus on Karen's release.
>
> Kevin – can you help in preparing Karen?  You were present during the proffers, know the facts better than anyone, and hopefully can help Karen in preparing answers to the questions the State is after now.

(Exhibit A.)

{¶ 26} Axline met with the prosecutor, and he agreed to recommend judicial release.  Edwards represented Axline in court proceedings related to her motion for judicial release.  The trial court granted the motion, and Axline was released from prison in December 2010.

{¶ 27} In granting summary judgment in the instant case, the trial court found that the parties' attorney-client relationship terminated on November 25, 2009—the date on which Edwards filed the notice of appeal on Axline's behalf.  Axline argues that the record contains evidence that contravenes the trial court's finding.  Looking at the actions of the parties, we perceive two actions that could indicate the termination of the attorney-client

relationship. First, Conners told Candace that "it would be best for someone else to take [the] whole thing over" within a day of Axline's October 23, 2009 sentencing. (Conners Depo., 102-03.) Conners believed that his conversation with Candace ended his attorney-client relationship with Axline.

{¶ 28} While such a conversation could signal a severing of the parties' relationship, it is belied by Axline's version of events. According to Axline, sometime during the two weeks after her sentencing, Conners visited her in jail and advised her "to get someone [else] to look at the case [and] also to file the appeal and then they would work together." (Axline Depo., 39.) Speaking about that time, Axline stated, "I never realized [the attorney-client relationship] had terminated. I considered him to be – I didn't think he would just leave me in prison. I expected him to be totally part of the case." (Axline Depo., 38.)

{¶ 29} Moreover, Conners' own actions show that the attorney-client relationship had not completely ended in late October 2009. Conners filed a motion for reconsideration and a reply in support of that motion *after* his conversation with Candace. In his deposition, Conners characterized these actions as "batting some cleanup" and acknowledged that, due to his filing of the motion and reply, his representation of Axline continued past October 23 or 24, 2009. (Conners Depo., 210.)

{¶ 30} Given the conflicting evidence, we conclude that questions of fact remain regarding whether the late October discussion between Conners and Candace terminated the attorney-client relationship. We thus turn to the second action that could have indicated the end of the relationship: Axline's engagement of another attorney.

{¶ 31} As we stated above, hiring another attorney to work on the same matter for which the client hired the first attorney may terminate an attorney-client relationship. *Nichter* at ¶ 20. In its decision, the trial court never explicitly stated that Axline's retention of Edwards constituted the act that severed the relationship with Conners. However, the trial court implicitly communicated this conclusion when it designated November 25, 2009—the date of Edwards' first appearance in court on Axline's behalf—as the date on which the parties' relationship ended.

{¶ 32} To rebut this conclusion, Axline directs us to the email correspondence between Candace and Conners. She maintains that this correspondence shows that

Conners performed legal work for her after November 25, 2009, so he remained her attorney after that date. The trial court recognized that the record contained evidence that Conners was still involved in Axline's legal struggles after November 25, 2009, but it found that Conners was merely an unpaid consultant during that period. This characterization relied on Axline's deposition testimony, in which Axline herself called Conners a consultant. But that is only half the story. In full, Axline testified as follows:

> Q: And tell me how it is that you came to be represented by Mr. Edwards.
>
> A: When – right after I was sentenced Kevin said, ["]We need more eyes on this.["]  And Candace found Joe. And the intention was for him to work with Kevin to get me out of there.
>
> Q: Do you have any understanding as to whether Mr. Conners himself did any work on your appeal?
>
> A: I think he consulted with Joe.
>
> * * *
>
> Q: Do you have a belief that Mr. Conners was representing you during the course of the appeal?
>
> A: Well, yes. Particularly after the appeal was dismissed. And they decided – I believe jointly – that a judicial release would be – would get me out of there sooner.
>
> * * *
>
> Q: Okay. Have you seen any notices of appearance filed by Mr. Conners in the appellate action?
>
> A: He was not involved with the appeal. Only as a consultant. It was when * * * it was decided jointly for my best course of action to be a judicial release that he became relevant.
>
> * * *
>
> Q: You didn't have an agreement with Kevin Conners that he would represent to you or provide legal advice to you regarding the appeal, did you?

A: I never realized it had terminated. I considered him to be –
I didn't think he would just leave me in prison. I expected
him to be totally part of the case.

Q: But you had hired Mr. Edwards to represent you on the
appeal, hadn't you?

A: On Mr. Conners' advice.

Q: Wait a minute. I thought you told me Candace was the one
who found Mr. Edwards?

A: Candace found Joe. But Kevin advised me to get someone
to look at the case [and] also to file the appeal and then they
would work together.

 (Axline Depo., 30-32, 38-39.)

{¶ 33} In Axline's view, Conners only consulted on the appeal but he represented her in tandem with Edwards for purposes of the motion for judicial release. This testimony, therefore, does not necessarily show that Conners' representation of Axline terminated upon her engagement of Edwards.

{¶ 34} Additionally, we are hesitant to draw any conclusions about the duration of the attorney-client relationship based on whether Conners charged Axline for legal work after she hired Edwards. The record contains only one bill from Conners, sent October 3, 2007. Axline did not remember receiving any other bills, and Conners admitted that he "did not send her very many bills." (Conners Depo., 195.) In his deposition, Conners replied, "Correct," when the questioning attorney stated, "[Y]ou recognized the fact that Karen was having some financial problems and you maybe weren't treating this like you would a normal case in terms of billing her for everything you were doing." (Conners Depo., 195.) If Conners was not billing Axline for all his work, then the lack of a bill does not necessarily indicate the lack of an attorney-client relationship.

{¶ 35} The ultimate question here is whether Axline filed her suit against Conners within the one-year statute of limitations. Axline filed her suit on June 7, 2011. On appeal, Conners argues that he is entitled to summary judgment unless Axline can demonstrate that the attorney-client relationship continued past June 7, 2010 into the one-year period prior to her filing suit. This argument turns the applicable precedent on its head. To prevail on summary judgment, Conners must point to a clear and

unambiguous affirmative action terminating the attorney-client relationship that occurred prior to June 7, 2010. *See Boggs* at ¶ 18; *Duvall* at ¶ 27. If Conners cannot prove a decisive act that terminated the parties' relationship before June 7, 2010, then a trier of fact must decide when the relationship terminated.

{¶ 36} The most definitive affirmative action that Conners can point to is Axline's retention of Edwards. But Axline maintains that she hired Edwards in addition to, not in replacement of, Conners. Thus, the actions Conners took for Axline in 2010 are significant because they show whether the attorney-client relationship between Conners and Axline survived the hiring of Edwards.

{¶ 37} Reviewing the entirety of the record, we can identify evidence that supports Conners' contention that the attorney-client relationship terminated when Axline hired Edwards. Conners did not visit Axline in prison, he did not communicate with Axline while she was in prison, and he did not sign the motion for judicial release or otherwise appear in court with regard to the motion for judicial release. All this evidence bolsters Conners' case that he ceased being Axline's attorney after she retained Edwards.

{¶ 38} On the other hand, we can also identify evidence to the contrary; namely, the April through June 2010 emails. In those emails, Conners described the legal research he intended to do and directed Candace to send him evidentiary material to support the motion for judicial release. Conners repeatedly spoke of what "we," i.e., he and Edwards, planned to do regarding Axline's motion for judicial release. Moreover, Conners never demurred when Candace referred to him as Axline's attorney and told him that Axline wanted his continued involvement.

{¶ 39} In short, the evidence is equivocal. A trier of fact could conclude from the evidence that Conners was a mere consultant, only relied on for his familiarity with the underlying facts. Alternatively, a trier of fact could conclude that Conners continued to perform legal work for Axline.

{¶ 40} Given the conflicting evidence in the record, we conclude that the trial court erred in granting Conners summary judgment. The question of when an attorney-client relationship terminates is normally a question of fact. *Smith* at ¶ 9. This record does not contain the type of evidence necessary for a court to decide that question as a matter of law. Accordingly, we sustain Axline's first assignment of error.

{¶ 41} By Axline's second assignment of error, she argues that the trial court erred in granting ProAssurance summary judgment on the third-party claims Conners asserted against it. We find that Axline does not have standing to appeal that ruling.

{¶ 42} "Appeal lies only on behalf of a party aggrieved by the final order appealed from." *Ohio Contract Carriers Assn., Inc. v. Pub. Util. Comm.*, 140 Ohio St. 160 (1942), syllabus. A party is aggrieved, and thus has standing to appeal, if (1) he has a present interest in the subject matter of the litigation and (2) he has been prejudiced by the judgment of the trial court. *Willoughby Hills v. C. C. Bar's Sahara, Inc.*, 64 Ohio St.3d 24, 26 (1992); *Chase Bank USA, N.A. v. Jacobs*, 10th Dist. No. 11AP-343, 2012-Ohio-64, ¶ 7. The interest in the underlying litigation must be immediate, and not a remote consequence of the judgment. *Midwest Fireworks Mfg. Co. v. Deerfield Twp. Bd. of Zoning Appeals*, 91 Ohio St.3d 174, 177 (2001). "A future, contingent, or speculative interest is not sufficient to confer standing to appeal." *Id.* To show prejudice, the party must demonstrate that the trial court's error injuriously affected him. *Ohio Contract Carriers Assn., Inc.* at 161.

{¶ 43} Generally, a party does not have standing to prosecute an appeal to protect the rights of a third party. *Warino v. Worldwide News Corp.*, 7th Dist. No. 12 MA 153, 2013-Ohio-5884, ¶ 14; *Mulqueeny v. Mentor Chiropractic Ctr., Inc.*, 11th Dist. No. 2001-L-034 (Apr. 12, 2002). In such an appeal, the appealing party is usually unable to demonstrate its own present interest in the appealed issue.

{¶ 44} Here, defendants sued ProAssurance for breach of an insurance policy to which Axline is neither a party nor an intended third-party beneficiary. Axline has not pointed to any present interest she has in the outcome of the suit between defendants and ProAssurance. Conceivably, Axline has an interest in assuring the collectability of any judgment she may win against defendants, and retaining ProAssurance as a party to the overall litigation will further that interest. Axline, however, will not have any claim against ProAssurance unless she first obtains a judgment for damages against defendants. *See* R.C. 3929.06(B); *accord W. Broad Chiropractic v. Am. Family Ins.*, 122 Ohio St. 497, 2009-Ohio-3506, ¶ 28 ("R.C. 3929.06(B) precludes an injured person from bringing a civil action against the tortfeasor's insurer until the injured person has first obtained a judgment for damages against the insured and the insurer has not paid the judgment

within 30 days."). Consequently, at this point in the litigation, Axline only has a contingent interest in the dispute between defendants and ProAssurance. She does not have the immediate interest necessary for her to have standing to appeal. *See State Auto Mut. Ins. Co. v. Bd. of Trustees Fraternal Order of Eagles Aerie 2232*, 4th Dist. No. 01CA728, 2003-Ohio-1057, ¶ 22-24 (victim injured by a tortfeasor had no standing to appeal the grant of a judgment that excused an insurer from indemnifying the tortfeasor); *St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 83 (2d Cir.2005) (plaintiff could not appeal the dismissal of a third-party complaint seeking a declaration that the third-party-defendant insurers were required to defend and indemnify the defendant). Accordingly, we overrule Axline's second assignment of error.

{¶ 45} For the foregoing reasons, we sustain the first assignment of error and overrule the second assignment of error. We affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas, and we remand this cause to that court for further proceedings in accordance with law, consistent with this decision.

*Judgment affirmed in part and reversed in part;*
*cause remanded.*

TYACK and DORRIAN, JJ., concur.

_____