[Cite as *Maccarone v. Mark Mandell-Brown, M.D., Inc.*, 2025-Ohio-5071.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | | |
|---|---|---|---|
| GINA MACCARONE, M.D., | : | APPEAL NO. | C-250052 |
| | | TRIAL NO. | A-2404138 |
| Plaintiff-Appellee, | : | | |
| vs. | : | | |
| MARK MANDELL-BROWN, M.D., INC., | : | *JUDGMENT ENTRY* | |
| Defendant/Counterclaim Plaintiff-Appellant, | : | | |
| and | : | | |
| MARK MANDELL-BROWN, M.D., | : | | |
| Counterclaim Plaintiff-Appellant, | : | | |
| vs. | : | | |
| MEGHAN JOHNSON, et al., | : | | |
| Defendants. | : | | |

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed, and the appeal is dismissed in part.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed 50 percent to Mark Mandell-Brown, M.D., Inc., and 50 percent to Mark Mandell-Brown, M.D.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.

# OHIO FIRST DISTRICT COURT OF APPEALS

**To the clerk:**

**Enter upon the journal of the court on 11/7/2025 per order of the court.**

**By:**_____

       **Administrative Judge**

[Cite as *Maccarone v. Mark Mandell-Brown, M.D., Inc.*, 2025-Ohio-5071.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| GINA MACCARONE, M.D., | : | APPEAL NO. C-250052 |
| | | TRIAL NO. A-2404138 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| MARK MANDELL-BROWN, M.D., INC., | : | *O P I N I O N* |
| Defendant/Counterclaim Plaintiff-Appellant, | : | |
| and | : | |
| MARK MANDELL-BROWN, M.D., | : | |
| Counterclaim Plaintiff-Appellant, | : | |
| vs. | : | |
| MEGHAN JOHNSON, et al., | : | |
| Defendants. | : | |

Civil Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed and Appeal Dismissed in Part

Date of Judgment Entry on Appeal: November 7, 2025

*The Janszen Law Firm* and *August T. Janszen*, for Plaintiff-Appellee Gina Maccarone, M.D.,

*Hemmer Wessels McMurtry PLLC* and *Scott R. Thomas*, for Defendant/Counterclaim Plaintiff-Appellant Mark Mandell-Brown, M.D., Inc., and Counterclaim Plaintiff-Appellant Mark Mandell-Brown, M.D.

**ZAYAS, Judge.**

{¶1} This dispute arises between an employer and several former employees. The case was initiated by plaintiff-appellee Gina Maccarone, M.D., when she filed a complaint "for declaratory judgment, temporary restraining order, preliminary injunction, and compensatory damages" against her former employer, defendant-appellant Mark Mandell-Brown, M.D., Inc., ("MMBI"). Her claims arose from an alleged unlawful covenant not to compete ("the noncompete agreement") in her employment agreement with MMBI.

{¶2} Thereafter, a flurry of other claims, and parties, were added to the case. First, MMBI, in combination with Mark Mandell-Brown, M.D. ("Dr. Mandell-Brown"), filed several counterclaims—*see* Civ.R. 13(H)—against Dr. Maccarone, and also initiated several other claims against three other former employees of MMBI, Meghan Johnson, Melissa Hargis, and Kendall Hemsath. These claims included conversion, unjust enrichment, defamation, "tortious interference with contract and business relations," breach of fiduciary duty, breach of duty of good faith and loyalty, civil conspiracy, breach of contract, declaratory judgment, injunctive relief, and punitive damages. Relevant here, MMBI sought a declaratory judgment that the noncompete agreement with Dr. Maccarone was valid and enforceable, and "preliminary and permanent injunctive relief to the extent necessary to enforce the restrictive covenant because it has no adequate remedy at law." Next, Dr. Maccarone amended her complaint to add claims against MMBI for wrongful discharge and punitive damages. Then, defendant Hemsath filed counterclaims against MMBI and Dr. Mandell-Brown for abuse of process and punitive damages. Further, MMBI amended its responsive pleading to Dr. Maccarone to add another counterclaim for breach of contract. Several motions to dismiss were also filed by and against various

4

parties.

{¶3} Intermixed within the flurry of pleadings and responsive motions, Dr. Maccarone filed a motion for a preliminary injunction. After responsive briefing and a hearing, the trial court granted the motion, enjoining enforcement of the noncompete agreement between MMBI and Dr. Maccarone. In doing so, the trial court denied MMBI's "cross-motion" for a declaratory judgment that the noncompete agreement was enforceable. MMBI and Dr. Mandell-Brown—claiming to both be "defendants"—filed a notice of appeal from this order, and it is this interlocutory order that is the subject of this appeal. The remaining litigation is still ongoing in the trial court.

{¶4} MMBI and Dr. Mandell-Brown assert a single assignment of error, arguing that the trial court erred in granting Dr. Maccarone's motion for a preliminary injunction. For the reasons that follow, we dismiss the appeal of Dr. Mandell-Brown for lack of standing, and we overrule MMBI's sole assignment of error and affirm the judgment of the trial court.

## I. The Relevant Restrictive Covenants in the Employment Agreement

{¶5} On September 21, 2022, Maccarone and MMBI entered into a two-year employment agreement, beginning on October 1, 2022.[1] Among other things, the agreement contained the following restrictive covenants:

(a) Employee agrees that during the terms of this Agreement, and for a period of two (2) years after the termination of Employee's employment with the practice, within the Restricted Area, Employee shall not, directly or indirectly:

---

[1] The compensation provisions of the employment agreement were amended in October 2023, with all other provisions of the agreement remaining in full force and effect.

(i) Engage, individually, in partnership or through a corporation or any entity as a proprietor, owner, manager, employee, stockholder, consultant, independent contractor, or otherwise, in the practice of facial and/or body cosmetic medicine, or liposuction;

(ii) Solicit or contact anyone who, during the terms of this Agreement, was a patient of the Practice, for purposes of continuing to provide any services to those individuals; or

(iii) Hire, solicit or, [sic] encourage any person working for the Practice to leave the employment of the Practice.[2]

(b) As used herein:

(i) 'Restricted Area' means a fifteen (15) mile radius 'as the crow flies' of the Practice's main office at 10735 Montgomery Road, Cincinnati, Ohio 45242 and a fifteen (15) mile radius of the Practices satellite office at 1512 Yankee Park Place, Centerville, Ohio 45458 (or any new Dayton/Centerville area office location established during the time of employee employment). The Parties agree that the Commonwealth of Kentucky is excluded from the 'Restricted Area.'

(ii) The phrase 'the practice of facial and/or body cosmetic medicine, or liposuction' shall be construed

---

[2] For purposes of this opinion, the restrictive covenant set forth in provision (a)(i) is referred to as "the noncompete agreement" and the restrictive covenant set forth in provision (a)(ii) is referred to as "the nonsolicitation agreement," while all restrictive covenants in provision (a) are cumulatively referred to as "the restrictive covenants."

broadly to include the procedures typically performed by physicians in these specialties. For avoidance of doubt, the covenants of Section 7(a) do not prohibit Employee from working after the termination of employment with the Practice in another generally recognized medical specialty, including without limitation, general surgery.

(c) Employee represents and acknowledges that enforcement of the covenants contained in this Agreement, including without limitation, the scope of medical practice, will not prevent Employee from earning a livelihood as Employee has the necessary qualifications and ability to reasonably expect to find work.

(d) The Employee acknowledges that the terms and conditions of the restrictive covenants in this Section 7 are reasonable and necessary for the protection of the Practice's business, trade secrets and confidential information and to prevent damage or loss to the Practice as a result of actions taken by the Employee. The purpose of the above covenants are to protect the Practice from the irreparable harm it will suffer if Employee competes in its territory after having been employed by the Practice and introduced to its referring physicians and patients, and after learning the Practice's special medical procedures, business procedures, office and practice policies and the special and confidential professional procedures developed by the Practice and its employed physicians and/or taught to Employee in the course of the Employee's employment relationship. EMPLOYEE UNDERSTANDS THAT EMPLOYEE'S EMPLOYMENT IS OFFERED SUBJECT TO SUCH

COVENANTS AND THE EMPLOYEE FREELY ACCEPTS SUCH LIMITATION. If any provision of this Section relating to the restrictive period, scope of activity restricted and/or territory described herein shall be declared by a court of competent jurisdiction to exceed the maximum time period, scope of activity restricted or geographical area such court deems reasonable and enforceable under applicable law, Employee and the Practice agree that the time period, scope of activity restricted and/or area of restrictions held reasonable and enforceable by the court shall thereafter be [the] restrictive period, scope of activity restricted and/or the territory applicable to the restrictive covenant provisions of this Section.

## II. *Dr. Mandell-Brown is Not a Proper Appellant*

{¶6} As an initial matter, the notice of appeal was filed by both MMBI and Dr. Mandell-Brown, claiming to both be "defendants." However, Dr. Mandell-Brown is not a "defendant" of Dr. Maccarone's claims. Dr. Maccarone only asserted claims against MMBI. Further, while Dr. Mandell-Brown appears to have joined some of MMBI's counterclaims under Civ.R. 13(H), the counterclaims relevant to this appeal do not reveal Dr. Mandell-Brown as an additional party asserting those claims.

{¶7} In the list of "causes of action" set forth in the original filed "counterclaim and complaint" against Dr. Maccarone and the several new defendants, two claims are relevant here: the claim for a declaratory judgment and the claim for injunctive relief. While both claims begin by stating in the first paragraph a general statement that "MMB[I] and Dr. Mandell-Brown incorporate each of the allegations..." previously set forth in the document, the paragraphs seeking relief for each claim only pertain to MMBI. First, the declaratory-judgment claim sets forth the relevant

8

provisions of the employment agreement, states that "an actual controversy exists *between Dr. Maccarone and MMB[I]* regarding the enforceability of the Restrictive Covenants," and asserts that "*MMB[I]* is entitled to an order declaring that the Restrictive Covenants are valid and enforceable as written." (Emphasis added.) Second, the claim for injunctive relief asserts, "*MMB[I]* is entitled to preliminary and permanent injunctive relief to the extent necessary to enforce the Restrictive Covenants because it has no adequate remedy at law." (Emphasis added.) This is different from the defamation, civil-conspiracy, and punitive-damages claims that assert that both MMBI *and* Dr. Mandell-Brown were damaged by the actions at issue in the claims. ("As a direct and proximate result of the conduct of Ms. Johnson and Dr. Maccarone, MMB[I] and Dr. Mandell-Brown have been damaged, and will continue to suffer damages, in an amount exceeding the jurisdictional threshold of this Court to be proven at trial"; "As a direct and proximate result of the tortious conduct of Dr. Maccarone and the Third-Party Defendants, MMB[I] and Dr. Mandell-Brown have suffered damage herein, in an unknown amount exceeding the jurisdictional threshold of this Court to be proven at trial"; "MMB[I] and Dr. Mandell-Brown are entitled to an award of punitive damages, costs, and attorney's fees."). Further, the later filed "Amended Counterclaim" appears to have only been filed by MMBI ("Now comes [MMBI], by and through counsel, and for its amended Counterclaim against Plaintiff Gina Maccarone, M.D., states . . ."), only added a claim by MMBI against Dr. Maccarone for breach of contract, and did not make any changes to the declaratory-judgment or injunctive-relief claims.

{¶8} Notably, the employment agreement is only between MMBI and Dr. Maccarone. Further, the memorandum in opposition to Dr. Maccarone's motion for a preliminary injunction and the combined responsive motion for a declaratory

judgment that the noncompete agreement was enforceable was only submitted by MMBI. Thus, the trial court's order only addressed the "Cross-Motion for Declaratory Relief" filed by the "Defendant," which was MMBI.

{¶9} "Generally, a party lacks standing to bring an appeal to protect the rights of a third party." *Hartford Fire Ins. Co. v. Debra-Kuempel, Inc.*, 2024-Ohio-5830, ¶ 45 (1st Dist.), citing *Axline v. Kevin R. Conners, LLC*, 2015-Ohio-4679, ¶ 43 (10th Dist.). "This is because only a party aggrieved by an order may bring an appeal." *Id.*, citing *Axline* at ¶ 43. "A party is aggrieved by an order and has standing to appeal the order if a party has a 'present interest in the subject matter of the ligation which has been prejudiced by the judgment of the lower court.'" *Id.*, *Willoughby Hills v. C.C. Bar's Sahara, Inc.*, 64 Ohio St.3d 24, 26 (1992).

{¶10} In *Hartford*, this court held that a party lacked standing to appeal a judgment in favor of a third-party defendant where the appealing party (the plaintiff, asserting a subrogation claim) lacked an interest in the dispute between the defendant and the third-party defendant (an indemnification and contribution claim) where the defendant's potential recovery from the third-party defendant "would have no immediate effect" on the plaintiff's claims against the defendant and the plaintiff had no claims against the third-party defendant. *Id.* at ¶ 48.

{¶11} Here, Dr. Mandell-Brown's claims in the case against Dr. Maccarone include defamation, civil conspiracy, and punitive damages. The defamation claim pertains to information allegedly provided by Dr. Maccarone to the Ohio State Medical Board. The civil-conspiracy claim appears to derive from alleged acts of Dr. Maccarone and the other employees that occurred during their employment with MMBI (e.g., converting company property for personal use, awarding business promotions to family members, directing clients to Dr. Maccarone instead of Dr.

Mandell-Brown, promoting similar services at other entities). The punitive-damages claim is based on "willful and wanton conduct exhibiting reckless disregard for the rights of MMB[I] and Dr. Mandell-Brown." None of these claims appear to pertain to the enforceability of the noncompete agreement, and it does not appear that any of these claims would be affected by the preliminary injunction.

{¶12} Further, the employment agreement specifically states that the restrictive covenants are necessary to protect "*the Practice's* business, trade secrets and confidential information and to prevent damage or loss to *the Practice* as a result of actions taken by the employee." (Emphasis added.) Even further, it states that the purpose of the restrictive covenants is

> to protect *the Practice* from the irreparable harm it will suffer if Employee competes in its territory after having been employed by the Practice and introduced to its referring physicians and patients, and after learning *the Practice*'s special medical procedures, business procedures, office and practice policies and the special and confidential professional procedures developed by *the Practice* and its employed physicians and/or taught to Employee in the course of the Employee's employment relationship.

(Emphasis added.)

{¶13} In *Tortbeck v. Indus. Mfg. Co.*, 2015-Ohio-3041 (1st Dist.), this court held that a principal shareholder and president of a manufacturing company lacked standing to appeal a judgment on certain claims asserted in the case— misappropriation of trade secrets and breach of the duty of loyalty—where the officer, in his individual capacity, did not allege an interest in these specific claims in the complaint and it was the company that held the enforceable rights on the claims—and

11

not the officer—as the duty of loyalty is owed to the employer, not its officers, and the company owns the company's trade secrets, not the officer. *Id.* at ¶ 16-17. Accordingly, this court held, "Because [the officer] did not raise these claims in the trial court and was not aggrieved by the judgment relating to misappropriation of trade secrets and the duty of loyalty, he lacks standing to challenge the trial court's judgment as it relates to those claims." *Id.* at ¶ 18.

{¶14} Here, Dr. Mandell-Brown is the shareholder and president of MMBI. However, he did not assert any claims pertaining to the employment agreement below and, under the terms of the employment agreement, it is *the practice* that holds the enforceable rights at issue. For these reasons, we hold that Dr. Mandell-Brown lacks standing to appeal from the trial court's judgment. We therefore dismiss his appeal.

### III. Background

### A. As Provided by Dr. Maccarone

{¶15} Dr. Maccarone lives in Indian Hill with her husband, a "semi-retired cardio and thoracic surgeon," and two stepchildren. She went to medical school at the University of Cincinnati ("UC") and trained at Good Samaritan Hospital for five years doing general surgery. She then completed a fellowship in trauma and critical care at UC and worked at Christ Hospital in a general-surgeon and critical-care position. She worked in this position at Christ Hospital for almost eight years. When she left this position in 2021, her salary was $450,000 a year. In this position, she "did a lot of minimally invasive surgery, robotic surgery, abdominal surgery, [and] skin cancer surgery," and "started a medical spa" for cosmetic treatments. She testified, "I always had a cosmetic disposition with all of my surgery patients as far as closures, scarring, those kinds of things." While at Christ Hospital, she was marketed as a "highly skilled surgeon," and provided various media content for patient engagement and general-

education purposes. In her Instagram marketing, she dubbed herself, "the Surgeonista."

{¶16} Dr. Maccarone always had an interest in cosmetic surgery and did "several months of plastic surgery during [her] general surgery training." Additionally, while working at Christ Hospital, she took "courses," learned how to do "injectable treatments," and started the medical spa because of her interest in cosmetic surgery. Once she reached a point in her career that she felt like she wanted "something more," she looked into the American Academy of Cosmetic Surgery fellowship training. This is how she "found" Dr. Mandell-Brown.

{¶17} She chose to complete this one-year program "where all you learn is cosmetic surgery," instead of the two-to-three year "classic plastic and reconstructive training program." This program allowed her to do "solely cosmetic surgery," like "breast, tummy, [and] liposuction," rather than "microsurgery, reconstruction, burn surgery, [or] flap surgery." In other words, she testified that the shorter program (the "ABCS certification") allows "graduates to do the type of surgery that they like to do without having to learn these other skills learned during plastic and reconstructive training" (the "PRS certification").

{¶18} Dr. Maccarone testified that "[m]ost hospitals in Cincinnati require that a surgeon have a board certification by what's called an ACGME training program." The PRS certification "is an ACGME training program, whereas cosmetic surgery is not." Consequently, she testified that she is prohibited "from obtaining cosmetic surgery privileges at the local hospitals, including Northern Kentucky, because [she's] not board certified in plastic and reconstructive surgery." This was said to include "all the hospitals here," including Christ Hospital, as well as "University of Cincinnati, Jewish, Mercy, Mercy Anderson, [and] Mercy West."

{¶19} When asked how she became involved in the fellowship with Dr. Mandell-Brown, she said that she approached him in 2021 to learn more about the training and also spend a day at the practice observing surgery. At the time, he had not accepted a fellow for the following cycle. He mentioned that, because she was from Cincinnati, it would be nice to have her as a fellow and have her potentially stay on and practice thereafter if things went well. She entered into a fellowship agreement with Dr. Mandell-Brown on October 4, 2021. Her annual salary as a fellow was $25,000, without bonuses. The first six months of the fellowship "are spent learning and observing surgery with Dr. Mandell-Brown." After that, the fellow can have their own independent cases at the discretion of Dr. Mandell-Brown. The fees from her work as a fellow went to MMBI. During her time as a fellow, she worked primarily at the Montgomery-Road location and "intermittently" at a location "in Springboro or south of Dayton." She claimed to be at the Cincinnati office 90 percent of the time. She said, "It was maybe one day a month when we would travel to Dayton."

{¶20} At the end of her fellowship, she was offered a two-year associate position. As part of this position, she entered into an employment agreement and her salary was increased to $275,000 a year, with a bonus opportunity. Throughout her employment, discussions were held about a potential buy-in to the practice at the end of her two-year position. So, when she was called to a meeting with Dr. Mandell-Brown in August 2024, she was under the impression that the meeting was to discuss more details of the practice purchase. Instead, she was "let go from the practice due to lack of productivity and just not making good business sense for the corporation."

{¶21} She has now opened a medical office in Cheviot, which is 30-45 minutes from her home. Beyond that, she has limited general surgery privileges at TriHealth and has obtained general and cosmetic surgery privileges at Highland District Hospital

in Hillsboro, Ohio, which is about an hour away.

{¶22} When asked why she can't perform surgery at her own office, she said, "I do some local procedures there, but because it's not a certified surgery center I am unable to do any types of procedures that require anesthesia." She testified that, typically, most surgeons report that it takes 18 to 24 months to build a surgery center and "maintain all of the certifications for use." Further, she testified that it would take six months to a year to get all her general surgery privileges back.

### B. *As Provided by Dr. Mandell-Brown*

{¶23} Dr. Mandell-Brown testified as to why he has "unique and customized surgical skills or approaches." He first said he has a unique method of patient consultation, which he does not "always see . . . done around the city and in the country." He testified about how he instructed Dr. Maccarone on her consultation skills.

{¶24} He further testified about his claimed unique surgical techniques. Regarding breast augmentation, he said that he uses an approach that he suggested was unique to this area—but not original, as he learned it from a friend in Texas. Regarding tummy tucks, he implied that his technique was not "special" to him but is not always done. He also claimed to teach his fellows to place the stiches in a certain manner that results in "superior" outcomes and "possibly" gives him a competitive advantage. Regarding facelifts, he said that he tries to "specialize a facelift for the patient's needs." Regarding injections, he uses a practice for which he "claims no origination" as he learned it from a doctor in Kansas. Regarding liposuction, he testified that he is different from his competitors in that "some of [his] competitors and colleagues [are] not turning down anybody." He further said that he differs from some of his competitors where he does long-term, follow-up care and in-person office

visits, while some others do virtual visits or no follow-up care. He also claimed that, when he came to the area, most competitors were doing procedures under general anesthesia, rather than IV sedation, whereas now only 40 to 50 percent do it under general anesthesia.

{¶25} He next testified about the alleged value of his business's financial information to his competitors. He said, "So unfortunately Cincinnati is a very competitive city -- almost a cutthroat city -- and my competitors would love to have this information." He said that he shared certain financial information with Dr. Maccarone in anticipation of her joining the practice that he would not have provided in the absence of the confidentiality agreement. Further, Dr. Maccarone was present at board meetings wherein they discussed "deliberately and in great detail everything that transpired in the surgical centers, including risk management, quality issues, number of cases that we've done, number of specific cases: facelifts, rhinoplasties, liposuction," and discussed future plans and marketing strategies based on patient data and satisfaction surveys. When asked what value the information from the board meetings would have to his competitors, he said, "Well, it's just privy to the way we conduct our business. It's a 20-page report that we went through today. It's very thorough."

{¶26} Regarding pricing, he testified that his pricing was part of his practice's competitive strategy and said his competitors "would love to know exactly what we charge everybody" because it is a competitive market in Cincinnati. He claimed that competitor access to this information "could be helpful" in undercutting his ability to attract patients. By virtue of her employment with the practice, Dr. Maccarone is familiar with his pricing strategy.

{¶27} Regarding advertising, he testified that the company annually markets

the 15-to-20-mile radius that overlaps the restricted area in the noncompete. He explained the practice's advertising of Dr. Maccarone during her employment within this area and said that he would not have done this advertising in the absence of the noncompete agreement.

**{¶28}** When asked to estimate the impact if Dr. Maccarone were able to practice in the restricted area and "affiliate with one of [his] competitors," he answered, "I can't put a dollar number it could be, but I think it would be irreparable harm." When asked by the trial court about his claim of irreparable injury and why allowing Dr. Maccarone to practice in the restricted area would be unfair competition, rather than ordinary competition, he said,

I put 150 percent in everything I do. I do. You don't know that, but you have to take my word for it.

When I train these fellows, these ten fellows, I give them my medical expertise. I'm a sought-after medical expert around the country. I don't advertise. I'm imparting safety on them. I am imparting my credentialing. I was a surveyor and am a surveyor for AAAHC on their board of directors, chairman of their survey and education.

I'm imparting that information to these doctors -- these ten doctors.

I'm imparting my ENT training, which was in the top three programs in the country. My facial plastic training was probably in the top two in the country. And all that education and training I am pouring into these individuals.

And I take everything I do to heart. When they do the

17

consultations, I want them to make sure they understand how to relate to patients.

As a general surgeon, Dr. Maccarone didn't get that. That's not how general surgeons act with patients. They see them once, they see them afterwards, and that's it. They're done.

Cosmetic is a whole different way. It's a way of thinking. I am passionately giving them that information. And I'm doing it because I want to commit to our profession, to grow the practice. And it's a commitment to expand our academy.

And so I want them to go out and be successful. I want them to go out and contribute to our academy in educational and committees and even in leadership, but I don't want them in my backyard.

I can't train and give them everything I've given and let them be down the street from me.

And I've trained ten of them. I can't have -- I just won't do it. I put too much into it to train my own competition. I'm cutting off my own throat.

I want her to be successful. I want her to contribute to our academy, but I don't want her in my backyard.

And in general 15 miles, which she asked for in her own words -- I used to have 20. She said can we do 15 and we mutually agreed.

This has nothing to do with anything, but my dad is 98 years old. He lives in his own apartment in Columbus, and he is a World War II veteran. And the only thing he taught me is honor. And you honor your word, and you honor your verbal agreement, and you certainly honor

your written agreement.

The fellow that I had yesterday, I brought him here. I didn't have to. This is noncompete. He's going to benefit if she wins. You enforce it.

So -- but I wanted him to see it because this is his education.

But he told me on the way home, he said I would honor what I agreed with you because that's what we decided and . . . the great generation . . . the great generation, they had honor.

## IV. The Preliminary Injunction

**{¶29}** Dr. Maccarone filed a motion for a preliminary injunction enjoining enforcement of "the non-competition restrictions and illegal restraints on trade" in the employment agreement with MMBI, or, in the alternative, an order enjoining enforcement of "the post-employment restrictions as applied to (1) locations more than five miles away from MMB[I]'s offices, and/or (2) any hospitals or private surgical centers where Dr. Maccarone may perform cosmetic surgeries, during the pendency of this case." The motion asserted that the noncompete agreement was "illegal, invalid, and unenforceable" for three reasons: (1) "MMB[I] lacks a legitimate business interest to enforce any post-employment non-competition restrictions upon Dr. Maccarone in the practice of medicine, because there is no actual or potential risk or evidence of *unfair competition* by Dr. Maccarone," (2) "[t]he restrictive covenants are patently and substantively 'unreasonable' in all respects -- including the temporal, geographic, and subject matter restrictions -- under the *Raimonde* factors, Ohio law, and the facts of the case," and (3)

[a]ny reasonable and equitable reformation of the restrictions, reducing the unreasonable restraints on trade to any alleged 'legitimate business

interest' or need to protect against unfair competition, if any, would require the restrictions to be reduced to a one year, five-mile radius from the MMB[I] Montgomery office, with such restrictions solely applying to the *medical office* where Dr. Maccarone may work or meet patients, and not to the surgery locations where she may perform surgery.

(Emphasis in original.)

{¶30} MMBI filed a memorandum in opposition to Dr. Maccarone's motion for a preliminary injunction, in which it argued that Dr. Maccarone's request for a preliminary injunction must be denied where "unclean hands bar equitable relief, she cannot meet her burden to establish entitlement to injunctive relief by clear and convincing evidence, and the weighing of the *Raimonde* factors requires enforcement of the non-compete agreement she voluntarily negotiated." The motion further asserted that "[t]he same facts that mandate denial of Dr. Maccarone's motion require granting MMB[I] declaratory relief as set forth in Count IX of its Counterclaim." Therefore, MMB[I] moved the trial court to declare "the noncompete provision in Dr. Maccarone's employment agreements to be reasonable and enforceable."

{¶31} Ultimately, after initial briefing, a hearing, and posthearing briefing/ written closing arguments, the trial court entered an order granting the preliminary injunction on January 30, 2025. First, the trial court found that there is a substantial likelihood that Dr. Maccarone will prevail on the merits as the noncompete agreement is unenforceable where (1) there is no evidence that Dr. Maccarone's competition is unfair to MMBI so limiting her ability to compete is merely preventing ordinary competition, and (2) even if there is a "legitimate interest in preventing competition because Dr. Maccarone's knowledge allowed her to compete unfairly, the

20

approximately six months that she has already complied with the agreement is more than sufficient." In doing so, the trial court found that (1) Dr. Maccarone has a "fundamentally different take on how to practice cosmetic surgery and how to run a practice," (2) Dr. Maccarone "is not using confidential information or trade secrets to replicate a practice based on the practice run by Dr. Mandell-Brown," (3) the surgical techniques that Dr. Maccarone learned while employed at MMBI "are not confidential or trade secrets," (4) Dr. Maccarone disposed of the financial information she had access to, as requested, and (5) the pricing strategy that Dr. Maccarone has knowledge of is not a trade secret. Additionally, the trial court found that (1) Dr. Maccarone will suffer irreparable harm in the absence of a preliminary injunction as her inability to practice would result in the loss of her surgical skills, which is harm that cannot be compensated with money damages, (2) there is no evidence that third parties will be unjustifiably harmed, and (3) the public interest is served as the law does not favor restrictive covenants.

{¶32} MMBI now appeals and argues in a single assignment of error that the trial court erred in granting Dr. Maccarone's motion for a preliminary injunction.

## V. Requirements for a Preliminary Injunction

{¶33} To prevail on a request for a preliminary injunction, a party must show by clear and convincing evidence that "(1) there is a substantial likelihood that she/he will prevail on the merits, (2) she/he will suffer irreparable injury if the injunction is not granted, (3) no third parties will be unjustifiably harmed if the injunction is granted, and (4) the public interest will be severed by the injunction." *Castillo-Sang v. Christ Hosp. Cardiovascular Assocs., LLC*, 2020-Ohio-6865, ¶ 16 (1st Dist.), citing *Proctor and Gamble Co. v. Stoneham*, 140 Ohio App.3d 260, 267-268 (1st Dist. 2000). "In determining whether to grant or deny injunctive relief, a court must balance all

four factors, and no single factor is dispositive." *Id.*, citing *Brookville Equip. Corp. v. Cincinnati*, 2012-Ohio-3648, ¶ 11 (1st Dist.).

**{¶34}** "Whether to grant or deny an injunction is within the discretion of the trial court, and a reviewing court will not disturb the judgment of the trial court absent an abuse of discretion." *Id.*, citing *Banker's Choice, LLC v. Zoning Bd. of Appeals of City of Cincinnati*, 2018-Ohio-3030 (1st Dist.), and *Garono v. State*, 37 Ohio St.3d 171, 173 (1988). "'An abuse of discretion occurs when "a court exercise[es] its judgment, in an unwarranted way, in regard to a matter over which is has discretionary authority."'" *Kross Acquisition Co, LLC v. Groundworks Ohio LLC*, 2024-Ohio-592, ¶ 17 (1st Dist.), citing *State v. Austin*, 2021-Ohio-3608, ¶ 5 (1st Dist.). "An abuse of discretion 'implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

### A. *Likelihood of Success on the Merits*

**{¶35}** The Ohio Supreme Court has held that "a noncompetition agreement is reasonable 'if the restraint is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public.'" *Id.* at ¶ 18, citing *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21 (1975), paragraph two of the syllabus.

> Among the factors to be considered in determining whether a particular noncompetition agreement is reasonable are: (1) whether the agreement contains time and space limitations; (2) whether the employee is the sole contact with the customer; (3) whether the employee has confidential information or trade secrets; (4) whether the covenant seeks to limit only unfair competition or is designed more broadly to eliminate ordinary competition; (5) whether the agreement

seeks to stifle the employee's inherent skill and experience; (6) whether the benefit to the employer is disproportional to the detriment to the employee; (7) whether the agreement bars the employee's sole means of support; (8) whether the skills that the agreement seeks to restrain were actually developed during the employment; and (9) whether the forbidden employment is merely incidental to the main employment.

*Id.*, citing *Raimonde* at 25.

### 1. *Whether the Agreement Contains Time and Space Limitations*

**{¶36}** The noncompete agreement does contain time and space limitations. Under the terms of the employment agreement, the restrictive covenants are to be in place "during this Agreement, and for a period of two (2) years after termination of Employee's Employment with the Practice." Further, the restrictive covenants apply to the "Restricted Area," which is defined in the agreement as "a fifteen (15) mile radius 'as the crow flies' of the Practice's main office at 10735 Montgomery Road, Cincinnati, Ohio 45242 and a fifteen (15) mile radius of the Practice's satellite office at 1512 Yankee Park Place, Centerville, Ohio 45458." The Commonwealth of Kentucky is not included in the "Restricted Area." Further, it should be noted that MMBI is not seeking to enforce the noncompete agreement as it relates to the satellite office. It is only seeking to enforce the 15-mile radius "as the crow flies" from "the Practice's main office."

### 2. *Whether the Employee is the Sole Contact with the Customer*

**{¶37}** This factor does not appear to be at issue. Nevertheless, the suggestion from the record is that Dr. Maccarone was not the sole contact with the patients of the practice. She testified about a "change in policy" in October 2023 where no new patients were to be scheduled with her unless they specifically asked for her by name. If they had not, they were to be scheduled with Dr. Mandell-Brown even if it would

23

cause delay.

### 3. *Whether the Employee has Confidential Information or Trade Secrets*

**{¶38}** Regarding confidential information, MMBI argues that Dr. Maccarone has access to financial information, pricing information, and business operation information.

**{¶39}** Regarding financial information, MMBI points to information that Dr. Maccarone received in a "valuation computation." In particular, MMBI focuses on page 17 of this report, which includes revenue and expense information for the practice in 2021, 2022, and 2023. Dr. Maccarone testified that she was only allowed to review the physical copy presented to her for around 45 minutes. Additionally, she testified that the electronic copy she received was "disposed of as requested by Dr. Mandell-Brown." Notably, Dr. Mandell-Brown was questioned on cross-examination as to whether he could testify about the exact financial figures provided in the valuation and he said that he could not do so without seeing an unredacted copy of the document. Dr. Maccarone is also subject to a nondisclosure agreement regarding this information.

**{¶40}** Regarding pricing, Dr. Mandell-Brown testified that pricing information is not publicized and is part of the practice's competitive strategy, and that Dr. Maccarone had access to this information during her employment and knows where MMBI's pricing falls on the "spectrum of pricing" in the area. However, he also testified that he tells his patients what they will be charged and does not require them to sign a nondisclosure agreement when doing so.

**{¶41}** Regarding both the financial information and pricing information, Dr. Mandell-Brown was asked during his testimony what value this information would

have to his competitors, and he answered that his competitors "would love" to have "this information" and "know what we charge everybody." However, when asked if competitors having the pricing information would "undercut the pricing of" the practice and the ability to attract patients, Dr. Mandell-Brown answered, "Well, pricing is only one factor in attracting patients, but it is an important factor. So, yes, it could be helpful."

{¶42} Lastly, regarding business operation information, Dr. Mandell-Brown testified that Dr. Maccarone was present at the annual board meeting wherein business operation information was discussed including "everything that transpired in the surgical center, including risk management, quality issues, number of cases that we've done, number of specific cases: facelifts, rhinoplasties, liposuction." When asked the value of this information to competitors, Dr. Mandell-Brown said, "Well, it's just privy to the way we conduct our business."

{¶43} Dr. Maccarone denied having "any documents or information from" MMBI's office. Additionally, in her supplemental affidavit—which was admitted as an exhibit at the hearing—Dr. Maccarone averred, "I possess no confidential or trade secret information of any kind concerning MMB[I] or Dr. Mandell-Brown." She further said, "I have no knowledge of Dr. Mandell-Brown's marketing plans, other than his widespread use of billboard marketing, which is not a secret. I do not possess any patient lists or patient contact information. I do not know anything relevant about Dr. Mandell-Brown's business, finances, or practice, which cannot be gleaned from his affidavit."

{¶44} MMBI does not appear to argue on appeal that any of this is a "trade secret." To the extent that it claims certain surgical techniques are "trade secrets," this is addressed under the eighth factor below.

25

### 4. Whether the Covenant Seeks to Limit Only Unfair Competition or is Designed More Broadly to Eliminate Ordinary Competition

**{¶45}** The employment agreement expressly states that the restrictive covenants are "necessary for the protection of the Practice's business, trade secrets and confidential information and to prevent damage or loss to the Practice as a result of actions taken by the Employee."

**{¶46}** To the extent that the noncompete agreement seeks to protect the identified "confidential" information, it is designed to prevent unfair competition. However, nothing in the record establishes that the noncompete agreement, as written, is necessary to protect this information. The noncompete agreement is for two years and seeks to prevent Dr. Maccarone from practicing "individually, in partnership, or through a corporation or any other entity as a proprietor, owner, or manager, employee, stockholder, consultant, independent contractor, or otherwise, in the practice of facial and/or body cosmetic medicine, or liposuction." Thus, the noncompete agreement seeks to prevent her from practicing cosmetic medicine in any capacity, which is broader than necessary to protect the identified "confidential" information. Further, there is nothing in the record to establish why it is necessary to enforce the noncompete agreement for two years to protect the "confidential" information.

**{¶47}** The trial court modified the noncompete agreement to be limited to the term of the agreement that Dr. Maccarone has already complied with (approximately six months). MMBI does not point to any evidence in the record or cite to any authority to show that such a finding was an abuse of discretion. Rather, it argues that "[h]aving to practice outside the 15-mile radius for two years is [a] small inconvenience compared to benefits she obtained." This argument does not establish why a two-year

26

noncompete agreement is reasonable and necessary, rather than the six-month restriction.

### 5. *Whether the Agreement Seeks to Stifle the Employee's Inherent Skill and Experience*

**{¶48}** The agreement seeks to stifle Dr. Maccarone's skill and experience regarding the practice of cosmetic surgery, but not general surgery.

### 6. *Whether the Benefit to the Employer is Disproportional to the Detriment to the Employee*

**{¶49}** Regarding this factor, MMBI appears to argue that the benefit to MMBI would be preventing Dr. Maccarone from "treating patients that MMB[I] competes for," and "padding the bottom line of MMB[I]'s competitors by earning them facility and anesthesia fees for procedures that would not otherwise be performed."

**{¶50}** Notably, nothing about the noncompete agreement, in and of itself, would prevent Dr. Maccarone from treating MMBI's patients outside the noncompete area. Rather, it seems that the nonsolicitation agreement would be the restriction in the employment agreement that provides this benefit, and the nonsolicitation provision does not appear to be at issue for purposes of the preliminary injunction. Nevertheless, from a general business perspective, MMBI would certainly benefit from not having to compete with Dr. Maccarone within the restricted area.

**{¶51}** On the other hand, the detriment to Dr. Maccarone is that she is unable to perform cosmetic surgery anywhere close to her home and is fully excluded from competing in the market that she trained and invested in.

### 7. *Whether the Agreement Bars the Employee's Sole Means of Support*

**{¶52}** The noncompete agreement does not bar Dr. Maccarone's sole means of support. She testified that she has limited general surgery privileges at TriHealth and general and cosmetic privileges at the Hillsboro hospital (Highland District Hospital).

Additionally, she has been able to perform a few liposuctions at an office adjacent to her new office and can continue to do so, subject to the availability of that office.

### 8. *Whether the Skills that the Agreement Seeks to Restrain Were Actually Developed During the Employment*

**{¶53}** The restrictive covenants in the employment agreement expressly state, "The purpose of the above covenants are to protect the Practice from the irreparable harm it will suffer if Employee competes in its territory after having been employed by the Practice and introduced to its referring physicians and patients, and after learning the Practice's special medical procedures, business procedures, office and practice policies and its employed physicians and/or taught to Employee *in the course of the Employee's employment relationship*."

**{¶54}** While the employment agreement does not expressly define "employment relationship," Section 1 of the employment agreement is entitled "Employment Relationship," and sets forth the expectations for "employment by the Practice," which "shall begin on or about October 1, 2022 and continue for two years." Thus, the "employment relationship" referenced in the restrictive covenants refers to Dr. Maccarone's employment term with MMBI that began upon completion of the fellowship and does not include Dr. Maccarone's fellowship term with MMBI.

**{¶55}** Rather, the fellowship term was covered by the "Fellowship Agreement" in the record, which contains its own restrictive covenants. The restrictive covenant in the fellowship agreement that is relevant here ("the fellowship noncompete restriction") states,

> In so far [sic] as the Fellow is privy to the patient demographics, marketing strategies, and confidential business details, a restrictive covenant is imposed to protect the interests of [MMBI]. The fellow

employee shall be prohibited from starting a cosmetic Facial and/or body cosmetic practice for 2 years from our main office . . . as well as our satellite office . . . and within 15 miles distance as the crow flies from each office. . . . This 2 year restriction begins upon completion of the Fellowship year or upon leaving the Fellowship during the Fellowship year.

**{¶56}** Notably, under the terms of the fellowship agreement, the fellowship noncompete restriction began on October 3, 2022 (the final day of the Fellowship year), and thus expired on or around October 3, 2024. The complaint was filed just shy of expiration of the fellowship noncompete restriction on September 16, 2024, and the trial court granted the preliminary injunction after expiration of the fellowship noncompete restriction on January 30, 2025.

**{¶57}** We note that the employment agreement begins by stating, "This Agreement supersedes all prior agreements among the parties related to the subject matter hereof." Therefore, it is not clear whether the fellowship noncompete restriction would still be enforceable. However, the enforceability of the fellowship noncompete restriction is not before this court, so we need not make any determinations on this issue.

**{¶58}** Nevertheless, it is notable that the fellowship agreement does not state that the fellowship noncompete restriction is necessary based on any training imparted to Dr. Maccarone during her fellowship. And because the restrictive covenants in the employment agreement only apply to things learned by or taught to Dr. Maccarone during the two-year employment term with MMBI, any skills that she acquired during the fellowship would not be skills "actually developed during the employment," as the "employment" at issue did not begin until after the fellowship

was over.

**{¶59}** On appeal, MMBI argues that it "opened every aspect of the practice to" Dr. Maccarone, and Dr. Mandell-Brown taught her "how to consult effectively with a patient about an elective procedure with options, a far more collaborative consultation compared to a general surgeon who meets with a patient with a medically necessary surgery." Further, it is alleged that Dr. Mandell-Brown taught Dr. Maccarone "the full panoply of cosmetic procedures and [Dr. Mandell-Brown's] unique approaches to augmentation, facelifts, injections, liposuction, and anesthesia."

**{¶60}** In the referenced testimony, Dr. Mandell-Brown testified that he taught Dr. Maccarone his "unique method of consultation" *during her fellowship*. Further, Dr. Mandell-Brown testified that he taught Dr. Maccarone his "unique" surgical approaches to breast augmentation and face lifts *during her fellowship*.

**{¶61}** Beyond that, Dr. Mandell-Brown testified about his admittedly nonoriginal approach to injections but did not specify who he taught these skills to, or when. Regarding liposuction, Dr. Mandell-Brown testified that he teaches the "fellows" to screen patients who really shouldn't have the procedure. He also testified about his post-liposuction care but said he was not sure that the approach "differed that much" from his competitors. He further testified about his "long-term follow up care and regular in-person office visits," and said that this differs from "some" of his competitors that either see patients virtually for follow-up care or have patients seen by staff for follow-up care, rather than the doctor. However, he did not testify as to who he taught these postoperative-care techniques to, or when. Further, he testified that he learned that Dr. Maccarone does postoperative care different from him as she "does a virtual Facetime follow up with her patient." Notably, his testimony appears to indicate that this was how Dr. Maccarone was doing postoperative care during her

employment with MMBI, as he said he learned about her use of FaceTime from another fellow. He said, "I found out because my last fellow, a patient that I gave her, was supposed to follow my protocol, didn't come in to examine the patient. She did it Facetime. I said that's not how I do it. You're supposed to follow me. Well, that's how Dr. Maccarone does it."

**{¶62}** Regarding anesthesia, he testified that he started the use of IV sedation, rather than general anesthesia, for facelifts and rhinoplasty in the area when he "first came to town." However, he also said that only "40 or 50 percent" of the practices in the area still do it under general anesthesia. This suggests that 50 to 60 percent of other practices in the area also now use this approach to sedation. Further, he did not testify as to who he taught these skills to, or when. Lastly, regarding tummy-tuck sutures, Dr. Mandell-Brown testified that he teaches "the fellows" about the sutures.

**{¶63}** Thus, the referenced testimony does not establish any skills "actually developed" by Dr. Maccarone during her employment term with MMBI, rather than during the fellowship term.

**{¶64}** This is supported by Dr. Mandell-Brown's testimony in response to a question from the trial court about why enforcement of the noncompete would be unfair, in which he testified heavily about how it is unfair *for fellows* to be allowed to compete "in [his] backyard." He said training his own competition would be "cutting off [his] own throat." Thus, the testimony clearly shows that MMBI is concerned about the use of skills that Dr. Maccarone developed *during the fellowship*, not skills developed during the subsequent employment.

**{¶65}** This is further supported by Dr. Maccarone's testimony, in which she indicated that during the term of her employment as an associate, they each treated their own patients, unless they were covering for each other. Additionally, in her

supplemental affidavit submitted in support of the temporary injunction—which was also admitted as an exhibit at trial—, she avers, "After I completed the MMB[I] fellowship program, I have had very limited involvement or exposure to any of Dr. Mandell-Brown's surgeries." She further said, "Dr. Mandell-Brown does not have any 'unique or customized' surgical skills or approaches, to my knowledge. My own skills, techniques, and practices are significantly different than Dr. Mandell-Brown, as I developed my core surgical skills, my interactions with patients, and my techniques over the eight years of general surgical experience."

{¶66} Therefore, the record does not reveal that the skills at issue were actually developed during the employment at issue, which is Dr. Maccarone's employment as an associate, not as a fellow.

{¶67} Further, to the extent that MMBI is claiming these techniques are "trade secrets" that need protection, the record fails to support this. Under R.C. 1333.61(D),

'Trade secret' means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

**{¶68}** Nothing in the record indicates any efforts to maintain the secrecy of these claimed "unique" techniques. *See generally Hanneman Family Funeral Home & Crematorium v. Orians*, 2023-Ohio-3687, ¶ 15 (stating that, among other things, a party claiming trade secrets must "take some active steps to maintain its secrecy.").

### 9. Whether the Forbidden Employment is Merely Incidental to the Main Employment

**{¶69}** The forbidden employment is not merely incidental to the main employment. Rather, the noncompete agreement seeks to prevent Dr. Maccarone from engaging, "individually, in partnership or through a corporation or any other entity as a proprietor, owner, manager, employee, stockholder, consultant, independent contractor, or otherwise, in the practice of facial and/or body cosmetic medicine, or liposuction." Thus, the noncompete agreement seeks to restrain the exact employment at issue, which is the practice of cosmetic medicine.

### 10. The Record Supports that Dr. Maccarone is Likely to Succeed on the Merits as the Record Supports the Trial Court's Determination that the Noncompete Agreement is Unreasonable

**{¶70}** Based on consideration of the evidence within the context of the *Raimonde* factors, the record supports that the noncompete agreement is greater than required for the protection of MMBI. Therefore, the record supports the trial court's determination that the noncompete agreement, as written, is unreasonable. Consequently, the trial court's determination that there is a substantial likelihood that Dr. Maccarone will succeed on the merits is also supported by the record.

### B. Irreparable Harm

**{¶71}** MMBI further challenges the trial court's finding that Dr. Maccarone would be irreparably harmed "if her noncompete promise was enforced" where such a finding "relied on the speculative notion that Dr. Maccarone would lose her surgical

skills if the agreement was enforced."

{¶72} At the hearing, Dr. Maccarone was asked why it was important for a surgeon to be active. She answered,

> That's actually why the hospitals require case logs to begin with because surgeons who aren't active or performing surgery can begin to lose their skills and efficiency, quality, all those things. Typically, in an informal way, taking more than six months away from operating for a surgeon is –requires some kind of remediation or reentry.

She further said it potentially impacts patients as it "contributes to safety, quality, [and] efficiency."

{¶73} The evidence presented by Dr. Maccarone established that she has been denied privileges at area hospitals in cosmetic surgery as she did not have the proper certification. The only hospital that she was able to obtain privileges from was a hospital in Hillsboro, which is over an hour away. She is also able to perform liposuction procedures at a practice adjacent to her new practice but is "limited by the amount of usage that he has for his practice." She is in the process of obtaining privileges at a private surgery center in Dayton; however, she testified that her patients have "expressed hesitation to have their surgery there because it's so far."

{¶74} Because of her limited options, she is seeking to be able to complete surgeries at local surgical centers, similar to Dr. Mandell-Brown's practice, which is also a surgical center (and presumably where she conducted surgery during her employment with MMBI). However, she is restricted from doing so because of the noncompete agreement.

{¶75} Given the evidence in the record that Dr. Maccarone's ability to practice cosmetic surgery is being stifled and that such inactivity can cause loss of skill, this

court cannot conclude that the trial court abused its discretion in finding that Dr. Maccarone would be irreparably harmed in the absence of the preliminary injunction.

### C. Harm to Third Parties and Public Interest

{¶76} MMBI does not present any argument challenging the trial court's findings on the absence of harm to third parties or the public interest.

### VI. Conclusion

{¶77} Based on the foregoing, we hold that the trial court did not abuse its discretion when granting Dr. Maccarone's request for a preliminary injunction as the trial court's decision was not unreasonable, arbitrary or unconscionable. Therefore, we overrule the assignment of error and affirm the judgment of the trial court. Further, we dismiss the appeal of Dr. Mandell-Brown for lack of standing.

Judgment affirmed and appeal dismissed in part.

**KINSLEY, P.J.,** and **NESTOR, J.,** concur.